JON 0. NEWMAN, Circuit Judge:
This case comes to us raising issues concerning a contractual arrangement known as a “cash-settled total return equity swap agreement” although our disposition at this stage of the appeal touches only tangentially on such issues.
The Children’s Investment Fund Management (“TCI”) and 3G Capital Partners (“3G”)[1] are hedge funds that entered into cash-settled total-return equity swap agreements referencing shares of CSX Corporation (“CSX”). They later sought to elect a minority slate of candidates to CSX’s board of directors. Alleging that TCI and 3G (“the Funds”) had failed to comply in a timely fashion with the disclosure requirements of section 13(d) of the Williams Act, 15 U.S.C. § 78m(d), CSX brought the present action. It sought injunctions barring the Funds from any future violations of section 13(d) and preventing the Funds from voting CSX shares at the 2008 CSX annual shareholders’ meeting.
The District Court held that the Funds had violated section 13(d) and granted a permanent injunction against further such violations with respect to shares of any company. See CSX Corp. v. Children’s Investment Fund Management (UK) LLP, 562 F.Supp.2d 511, 552, 554-55, 573-74 (S.D.N.Y.2008) (“CSX /”). However, the Court declined to enjoin the Funds from voting their CSX shares. See id. at 568-72. CSX appealed the denial of the voting injunction; the Funds cross-appeal *279 ed the granting of the permanent injunction. On September 15, 2008, we affirmed the District Court’s denial of the voting injunction. CSX Corp. v. Children’s Investment Fund Management (UK) LLP, 292 Fed.Appx. 133, 133-34 (2d Cir.2008) (“CSX II ”). In this opinion, we consider some of the issues raised by the Funds’ cross-appeal and explain the reasons for our earlier order in CSX’s appeal.
The parties have endeavored to frame issues that would require decision as to the circumstances under which parties to cash-settled total-return equity swap agreements must comply with the disclosure provisions of section 13(d). Such issues would turn on the circumstances under which the long party to such swap agreements may have or be deemed to have beneficial ownership of shares purchased by the short party as a hedge.
Rather than resolve such issues, as to which there is disagreement within the panel, we consider at this time only issues concerning a “group” violation of section 13(d)(3) with respect to CSX shares owned outright by the Defendants (without regard to whatever beneficial ownership, if any, they might have acquired as long parties to cash-settled total-return equity swap agreements). Because we lack sufficient findings to permit appellate review of such issues, we remand for further findings.
Background
We describe here only the salient facts and District Court proceedings, leaving many details to the Discussion section.
TCI and 3G (“the Funds”) are investment funds that in 2006 came to believe that CSX, a large railroad company, had unrealized value that a change in corporate policy and perhaps management might unlock. The Funds purchased shares in CSX and entered into cash-settled total-return equity swaps referencing CSX stock. The Funds then engaged in a proxy fight with the management of CSX.
(a) Cash-settled total-return equity swaps. Total-return swaps are contracts in which parties agree to exchange sums equivalent to the income streams produced by specified assets. Total-return equity swaps involve an exchange of the income stream from: (1) a specified number of shares in a designated company’s stock, and (2) a specified interest rate on a specified principal amount. The party that receives the stock-based return is styled the “long” party. The party that receives the interest-based return is styled the “short” party. These contracts do not transfer title to the underlying assets or require that either party actually own them. Rather, in a total-return equity swap, the long party periodically pays the short party a sum calculated by applying an agreed-upon interest rate to an agreed-upon notional amount of principal, as if the long party had borrowed that amount of money from the short party. Meanwhile, the short party periodically pays the long party a sum equivalent to the return to a shareholder in a specified company — the increased value of the shares, if any, plus income from the shares — as if the long party owned actual shares in that company.
As a result, the financial return to a long party in a total-return equity swap is roughly equivalent to the return when borrowed capital is used to purchase shares in the referenced company. Long swap positions can, therefore, be attractive to parties that seek to increase the leverage of their holdings without actually buying the shares. The short party’s financial return, in turn, is equivalent to the return to someone who sold short and then lent out the proceeds from that sale. However, because of the inherent risks in short- *280 equity positions — share value can be more volatile than interest rates — persons holding short positions in total-return equity swaps will usually choose to purchase equivalent numbers of shares to hedge their short exposure.
Total-return equity swaps may be “settled-in-kind” or “cash-settled.” When an equity swap that is settled-in-kind terminates, the long party receives the referenced security itself, in exchange for a payment equal to the security’s market price at the end of the previous payment period. When a cash-settled equity swap terminates, the short party pays the long party the sum of the referenced equity security’s appreciation in market value and other net cash flows (such as dividend payments) that have occurred since the most recent periodic payment. If this sum is negative, then the short party receives the corresponding amount from the long party. Unlike swaps settled in kind, cash-settled swaps do not give the long party a right to acquire ownership of the referenced assets from the short party. In all other respects, settled-in-kind and cash-settled equity swaps are economically equivalent.
(b) The transactions in the present case. The swaps purchased by the Funds were cash-settled total-return equity swaps referencing shares of CSX. The Funds were the long parties, and several banks were the short parties. Although the swap contracts did not require the short parties— the banks — actually to own any CSX shares, the Funds understood that the banks most likely would hedge their short swap positions by purchasing CSX shares in amounts matching the number of shares referenced in the swaps, and the banks generally did so.[2]
The Funds’ trading in CSX shares and CSX-referenced swaps followed no consistent pattern. During some periods the Funds increased their holdings; during other periods they decreased them. Almost immediately after making its initial investment in CSX, TCI approached the company to negotiate “changes in policy and, if need be, management [that] could bring better performance and thus a higher stock price,” CSX I, 562 F.Supp.2d at 523, which would allow TCI to profit from its swap holdings. TCI later explored the possibility of a leveraged buyout (“LBO”) of CSX, and informed other hedge funds of its interest in “altering CSX’s practices in a manner that TCI believed would cause its stock to rise.” Id. at 526. When it became clear that CSX had little interest in TCI’s proposed policy changes or LBO proposals, TCI began preparations for a proxy contest to effectuate its desired policy and management changes at CSX.
There is no doubt that the Funds wanted to avoid disclosure under the Williams Act until a time they believed suitable. Thus, TCI took care to disperse its swaps among multiple counterparties so that no one particular counterparty would trigger disclosure under the Williams Act by purchasing as a hedge more than 5 percent of a class of CSX securities.[3] TCI could not be certain how counterparties would vote their hedge shares but of course could vote *281 the shares that it owned. When a proxy-fight seemed likely, TCI decreased its swap holdings and purchased more CSX shares.
Meanwhile, the Funds engaged in various communications among themselves, with CSX’s management, and with some of the banks. As early as November 2006, TCI had contacted CSX and two banks— one in December 2006, and the other in January 2007 — about the possibility of a leveraged buyout. TCI also had communications with both Austin Friars, a hedge fund owned by Deutsche Bank, and with Deutsche Bank itself about CSX. TCI and 3G communicated between themselves at various times in 2007, but not until December 19, 2007, did they file a Schedule 13D with the SEC disclosing that they had formed a “group” by “enter[ing] into an agreement to coordinate certain of their efforts with regard [sic ] (I) the purchase and sale of [various shares and instruments] and (ii) the proposal of certain actions and/or transactions to [CSX].” CSX I, 562 F.Supp.2d at 535.
On January 8, 2008, the TCI-3G group proposed a minority slate of directors for the CSX board. See id. at 536. The vote on this proposal occurred at the June 25, 2008, CSX shareholders’ meeting.
(c) The present action. On March 17, 2008, CSX brought the present action against TCI and 3G in the Southern District of New York alleging, among other things, violation of the Williams Act, Pub.L. No. 90-439, 82 Stat. 454 (1968) (codified as amended at 15 U.S.C. §§ 78m(d)-(g), 78n(d),(f) (1988)), and various rules and regulations promulgated thereunder. The Williams Act added section 13(d) to the Securities Exchange Act of 1934 to require that, among other things, various disclosures be filed with the Securities and Exchange Commission (“SEC”) when a “person” has acquired “beneficial ownership” of more than 5 percent of an exchange-traded class of a company’s shares. 15 U.S.C. § 78m(d)(l). Included in the statute’s definition of a “person” is a “group [acting] for the purpose of acquiring, holding, or disposing of securities of an issuer.” 15 U.S.C. § 78m(d)(3).
The District Court held that, for purposes of section 13(d), TCI was deemed a beneficial owner of all CSX shares held by banks as hedges against TCI’s CSX-referenced swaps, and thus that TCI violated section 13(d) by failing to make timely filings once TCI’s combined holdings of CSX shares and CSX-referenced swaps crossed the 5 percent ownership threshold. See CSX Corp. I, 562 F.Supp.2d at 552. In making this ruling, the District Court considered whether TCI had beneficial ownership of the hedged shares pursuant to both SEC Rule 13d-3(a), which defines a beneficial owner,[4] and SEC Rule 13d-3(b), which identifies circumstances under which a person shall be deemed to be a beneficial owner.[5] See 17 C.F.R. § 240.13d-3 (a), *282 (b). Ultimately, the District Court did not rule on whether TCI was a beneficial owner under Rule 13d-3(a), see CSX I, 562 F.Supp.2d at 548, but did rule that TCI was deemed a beneficial owner under Rule 13d — 3(b) because it had “created and used the [swaps] with the purpose and effect of preventing the vesting of beneficial ownership in TCI as part of a plan or scheme to evade the reporting requirements of Section 13(d),” id. at 552.
The District Court also found that TCI and 3G violated section 13(d) by failing to make timely disclosure of having formed a “group” “with respect to CSX securities ... no later than February 13, 2007.” Id. at 555.
The Court granted CSX a permanent injunction against TCI and 3G, prohibiting any further violations of section 13(d), whether or not involving CSX shares. Id. at 573-74. The Court concluded that it was foreclosed as a matter of law from granting an injunction prohibiting the Funds from voting the 6.4 percent of CSX shares that they had acquired after forming a group. Id. at 568-72. CSX appealed this denial of an injunction against voting the disputed shares. The Funds cross-appealed the District Court’s finding that the Funds had violated section 13(d) and the grant of a permanent injunction against any future violations of section 13(d). On September 15, 2008, we entered an order affirming on CSX’s appeal, but deferred until now our discussion of the reasons for that order. See CSX II, 292 Fed.Appx. at 133-34.
Discussion
We leave discussion of the merits of the now-resolved CSX appeal, i.e., the issue of whether prohibiting the Funds from voting the CSX shares was an appropriate remedy for the alleged violation, to the end of this opinion, and turn to the Funds’ cross-appeal. As to that appeal, the panel is divided on numerous issues concerning whether and under what circumstances the long party to a cash-settled total return equity swap may be deemed, for purposes of section 13(d), the beneficial owner of shares purchased by the short party as a hedge. In view of that disagreement, we conclude that it is appropriate at this time to limit our consideration to the issue of group formation, see 15 U.S.C. § 78m(d)(3), an issue as to which we seek further findings from the District Court. All members of the panel are in agreement as to this disposition.
I. Statutory and Regulatory Framework
Section 13(d) provides in pertinent part: (1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 781 of this title ..., is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, [disclose to the issuer, the SEC, and the exchanges] a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors ....
(3) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of *283 acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a “person” for the purposes of this subsection.
15 U.S.C. § 78m(d)(l), (3).[6]
SEC Rule 13d — 5(b)(1) provides that the section 13(d) disclosure requirements apply to the aggregate holdings of any “group” formed “for the purpose of acquiring, holding, voting or disposing” of equity securities of an issuer. 17 C.F.R. § 240.13d-5(b)(l). This Rule tracks Section 13(d)(3) in all respects except that the Rule adds voting as a group for the purpose of triggering the disclosure provisions. Compare id. with 15 U.S.C. § 78m(d)(3). “‘[T]he touchstone of a group within the meaning of section 13(d) is that the members combined in furtherance of a common objective.’ ” Roth v. Jennings, 489 F.3d 499, 508 (2d Cir.2007) (quoting Wellman v. Dickinson, 682 F.2d 355, 363 (2d Cir.1982)).
II. “Group” Violation
There are three kinds of groups that might be found in the present matter. One might consist of one or more long parties (the Funds) and one or more short counterparties that have hedged with shares (the banks). The second might consist of the Funds, i.e., TCI and 3G. The third might consist of banks that have purchased shares as a hedge. Only the possibility of a group comprising TCI and 3G is at issue on this appeal.
As we have noted, the statute and the implementing rule are both concerned with groups formed for the purpose of acquiring shares of an issuer. See 15 U.S.C. § 78m(d)(3); 17 C.F.R. § 240.13d-5(b)(l). The District Court recognized that whether a group exists under section 13(d)(3) “turns on ‘whether there is sufficient direct or circumstantial evidence to support the inference of a formal or informal understanding between [members] for the purpose of acquiring, holding, or disposing of securities’ ” CSX I, 562 F.Supp.2d at 552 (quoting Hailwood Realty Partners, L.P. v. Gotham Partners, L.P., 286 F.3d 613, 617 (2d Cir.2002)) (emphasis added).
Endeavoring to meet the statutory standard, the District Court found that TCI *284 and 3G formed a group, within the meaning of section 13(d)(3), “with respect to CSX securities,” and that this group was formed no later than February 13, 2007. See id. at 555. Then, after identifying the Defendants’ “activities and motives throughout the relevant period,” id. at 553, the Court stated, “These circumstances ... all suggest that the parties’ activities from at least as early as February 13, 2007, were products of concerted action .... ” Id. at 554 (emphasis added).
These findings are insufficient for proper appellate review. Although the District Court found the existence of a group “with respect to CSX securities,” the Court did not explicitly find a group formed for the purpose of acquiring CSX securities. Even if many of the parties’ “activities” were the result of group action, two or more entities do not become a group within the meaning of section 13(d)(3) unless they “act as a ... group for the purpose of acquiring ... securities of an issuer.” 15 U.S.C. § 78m(d)(3).
Moreover, because the District Court deemed the Funds, as long parties to cash-settled total-return equity swap agreements, to have a beneficial interest in shares acquired by hedging short parties to such agreements, the Court did not distinguish in its group finding between CSX shares deemed to be beneficially owned by the Funds and those owned outright by the Funds. However, with our current consideration of a group violation confined to CSX shares owned outright by the Funds, a precise finding, adequately supported by specific evidence, of whether a group existed for purposes of acquiring CSX shares outright during the relevant period needs to be made in order to facilitate appellate review, and we will remand for that purpose. Because the combined total outright ownership of CSX shares by TCI and 3G crossed the 5 percent threshold by April 10, 2007, a TCI/3G group, if it was formed for the statutorily defined purpose, would have been required to file a section 13(d) disclosure within ten days, ie., by April 20, 2007, see 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-l. Thus, on remand the District Court will have to make findings as to whether the Defendants formed a group for the purpose of “acquiring, holding, voting or disposing,” 17 C.F.R. § 240.13d-5(b)(l), of CSX shares owned outright, and, if so, a date by which at the latest such a group was formed. Only if such a group’s outright ownership of CSX shares exceeded the 5 percent threshold prior to the filing of a section 13(d) disclosure can a group violation of section 13(d) be found.
III. Appropriateness of Injunctive Relief
Because on remand, the District Court might find a section 13(d) group violation with respect to a group acquisition of CSX shares outright and the Defendants, on the cross-appeal, have disputed the propriety of an injunction, even on the basis of the violations as found by the District Court, we will briefly consider some of the considerations relevant to injunctive relief.
It is settled in this Circuit that an issuer has an implied right of action to seek injunctive relief for a violation of section 13(d), see GAF Corp. v. Milstein, 453 F.2d 709, 720 (2d Cir.1971), but must satisfy traditional equitable requirements for an injunction, see Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 57, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). We have recognized that a prohibition on future securities law violations has “grave consequences” because it subjects a defendant to contempt sanctions and also has “serious collateral effects.” S.E.C. v. Unifund SAL, 910 F.2d 1028, 1040 (2d Cir.1990). The usual basis for prospective injunctive relief is not only irreparable harm, which is required for all *285 injunctions, see Rondeau, 422 U.S. at 57, 95 S.Ct. 2069 (citing Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)), but also “ ‘some cognizable danger of recurrent violation,’ ” Rondeau, 422 U.S. at 59, 95 S.Ct. 2069 (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)).
In this case, the District Court considered both irreparable harm and the probability of future violations. See CSX I, 562 F.Supp.2d at 572-73. Having held that the Funds violated section 13(d), the District Court issued a broad permanent injunction against future violations, an injunction not limited to CSX shares:
Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with any of the foregoing who receive actual notice of this injunction ... are enjoined and restrained from violating Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d), and Regulation 13D thereunder....
The District Court predicated this broad injunction on the basis of a section 13(d) violation that took into account not only the shares of CSX that the Funds owned outright but also the much larger quantity of shares purchased as hedges by the short parties to CSX-referenced swaps. Because this opinion considers only the more limited issue of whether the Funds, as a group, committed a violation of section 13(d) with respect to shares that they owned outright, if the District Court on remand finds the existence of a group formed to acquire CSX shares outright during the relevant period, it will have to reconsider the appropriateness of an injunction, and, if one is to be issued, what should be its appropriate scope.
If a section 13(d) violation is found, limited to a group violation with respect to purchase of the shares outright (which is the only violation considered in this opinion), the threat of future violations would be less substantial than appeared to the District Court, which based its broad injunction (ie., not limited to CSX shares) on its view that the Funds were deemed to be beneficial owners of the hedged shares purchased by the short parties to the swap agreements.
Another factor that would arguably weigh against a broad injunction is the disclosure that CSX made just prior to the expiration of the ten-day period following April 10, 2007, the date when the group’s total of CSX shares owned outright crossed the 5 percent threshold. On April 18, 2007, CSX filed its Form 10-Q for the period ending March 30, 2007. The Form 10-Q reported that TCI had made a filing under the Hart-Scott-Rodino Antitrust Improvements Act, Pub.L. No. 94-435, 90 Stat. 1383 (1976), of its intention to acquire more than $500 million of CSX stock and that TCI “currently holds a significant economic position through common stock ownership and derivative contracts tied to the value of CSX stock.” CSX I, 562 F.Supp.2d at 527 (internal quotation marks omitted). Thus, TCI’s control ambitions were known to the public before it was required to file under section 13(d), at least with respect to the group’s outright ownership of shares as of April 10, 2007. We recognize that a Hart-Scott-Rodino filing does not reveal all of the information required by a section 13(d) disclosure. Nevertheless, the filing has a bearing on the scope of relief warranted for the limited section 13(d) violation we have considered in this opinion.
On the other hand, if a section 13(d) violation, even a limited one, is found on the basis of a group purchase of shares outright and non-disclosure when the group’s holdings crossed the 5 percent *286 threshold, it would continue to be relevant that the District Court has found that some of the parties “testified falsely in a number of respects, notably including incredible claims of failed recollection.” CSX I, 562 F.Supp.2d at 573. The District Court was within its discretion in concluding that people who have lied about securities matters can reasonably be expected to attempt securities laws violations in the future.
Under all the circumstances, we will remand to the District Court so that it may (a) determine whether the evidence permits findings as to the formation of a group, as described above, a date by which at the latest such a group was formed, and whether such a group’s outright ownership of CSX shares crossed the 5 percent threshold prior to the filing of a section 13(d) disclosure, and (b) if a group violation of section 13(d) is found, reconsider the appropriateness and scope of injunctive relief based only on the group’s failure to disclose outright ownership of more than 5 percent of CSX’s shares.
IV. Injunctive “Sterilization” of the Disputed Shares
The District Court concluded that it was foreclosed as a matter of law from enjoining the Funds’ voting of CSX shares acquired between the latest date on which their section 13(d) disclosure obligations might have begun and the date on which they actually made those disclosures. See CSX I, 562 F.Supp.2d at 568-72. CSX argues that the Court should have enjoined the voting of those shares on three grounds: (I) courts generally have broad powers to grant injunctive relief; (ii) a “sterilization” injunction was necessary to promote the ends of the Williams Act both by leveling the playing field in the contest for corporate control in order to partially restore the integrity of the shareholder franchise and by deterring future violations of the Act’s disclosure provisions; and (iii) courts have “inherent authority” to sanction litigation misconduct.
In Treadway Companies, Inc. v. Care Corp., 638 F.2d 357 (2d Cir.1980), we held that “an injunction will issue for a violation of § 13(d) only on a showing of irreparable harm to the interests which that section seeks to protect.” 638 F.2d at 380. We also said that “[t]he goal of § 13(d) is to alert the marketplace to every large, rapid aggregation or accumulation of securities ... which might represent a potential shift in corporate control.” Id. (internal quotation marks omitted) (second alteration in original); see also Rondeau, 422 U.S. at 58, 95 S.Ct. 2069 (“The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party.”). Thus, the interests that section 13(d) protects “are fully satisfied when the shareholders receive the information required to be filed.” Treadway, 638 F.2d at 380; see also United States v. O’Hagan, 521 U.S. 642, 668, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (“Congress designed the Williams Act to make disclosure, rather than court imposed principles of ‘fairness’ or ‘artificiality,’ ... the preferred method of market regulation.”) (internal quotation marks and citation omitted) (alteration in original). Consequently, in Treadway, we held that because shareholders had received the required information four months before the proxy contest in that case, “there was no risk of irreparable injury and no basis for injunctive relief.” 638 F.2d at 380. In the present matter, the Funds’ section 13(d) disclosures occurred in December 2007, approximately six months before the June 25, 2008, shareholders’ meeting. Therefore, following Treadway, *287 we conclude that injunctive share “sterilization” was not available.
CSX, however, argues that the Williams Act does not aim merely at timely dissemination of information but more broadly “seeks to provide a level playing field and to promote compliance.” Appellant’s Brief at 48. For this proposition, CSX relies on a passing remark, in a footnote, in which the Supreme Court expressed skepticism about “whether ‘deterrence’ of § 14(e) violations is a meaningful goal, except possibly with respect to the most flagrant sort of violations which no reasonable person could consider lawful.” Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 40 n. 26, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). Far from supporting CSX’s claim, this remark mentions none of the goals of the Williams Act, concerns section 14(e) rather than section 13(d), and actually casts doubt upon the usefulness of determining remedies with an eye toward promoting compliance.
CSX also rests its “level playing field” claim on two Supreme Court cases that include “fair corporate suffrage” as among the original goals of the Securities Exchange Act of 1934: Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1103, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), and J.I. Case Co. v. Borak, 377 U.S. 426, 431, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). However, neither case attributed that goal to the Williams Act, and there is no reason to conclude that adequate timely disclosure of the information covered by the Williams Act would be insufficient to ensure the “fairness” of a subsequent shareholder vote.
CSX also argues that the importance of deterring violations of section 13(d) provides a general policy-based reason for prohibiting the Funds from voting the disputed shares. Refusing to “sterilize” the voted shares would, CSX argues, leave the Williams Act toothless. However, a statutory provision is not necessarily rendered toothless for lack of a particular sanction. We also note that the proposed sanction might have injured those shareholders who, fully informed, chose to vote with the insurgents.
The inappropriateness of share sterilization in such circumstances leaves open the question of what remedies might be appropriate when disclosure that is timely with respect to a proxy contest is not made, and we do not reach that issue here.
CSX quotes Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), to the effect that once a federal right of action exists there is a “traditional presumption” that courts can use “all available remedies” unless Congress clearly has provided otherwise. 503 U.S. at 72, 112 S.Ct. 1028. In a similar vein, CSX argues that because the District Court found that officials of both Funds testified falsely, see CSX I, 562 F.Supp.2d at 573, the Court was permitted to issue an injunction to “sterilize” the Funds’ disputed shares as a way of sanctioning abuses of the judicial process. However, neither the presumption about the general availability of remedies nor the responsibility of federal courts to protect the integrity of their proceedings, see, e.g., In re Martin-Trigona, 737 F.2d 1254, 1261 (2d Cir.1984), supersedes Treadway’s holding: in the case of section 13(d), an injunction prohibiting the voting of shares is inappropriate when the required disclosures were made in sufficient time for shareholders to cast informed votes. See Treadway, 638 F.2d at 380. Whether timely or not, the stated purpose of disclosure — allowing informed action by shareholders, see supra note 5 — was fulfilled.
Conclusion
The District Court’s denial of an injunction against the voting of shares is again *288 affirmed, the injunction issued to prohibit future violations of 13(d) is vacated, and the case is remanded to the District Court for further proceedings consistent with this opinion. In the event of a subsequent appeal, any party may restore jurisdiction to this Court by notice to the Clerk within 30 days of any order or judgment sought to be appealed, without a new notice of appeal, in which event such appeal will be referred to this panel. See United States v. Jacobson, 15 F.3d 19, 21-22 (2d Cir. 1994).

. The District Court described TCI and 3G as follows:
Defendants [are] The Children's Investment Fund Management (UK) LLP ...[,] The Children’s Investment Fund Management (Cayman) LTD[,].... [and] The Children’s Investment Master Fund.... These entities are run by defendant Christopher Hohn.... Defendant Snehal Amin is a partner of [The Children’s Investment Fund Management (UK) LLP], These five defendants are referred to collectively as TCI.
Defendants [are] 3G Fund L.P. ...[,] 3G Capital Partners L.P..... [and] 3G Capital Partners Ltd..... They are run by defendant Alexandre Behring.... These four defendants are referred to collectively as 3G.
CSX Corp. v. Children’s Investment Fund Management (UK) LLP, 562 F.Supp.2d 511, 518 (S.D.N.Y.2008) (“CSXI’’).

. There is evidence that at least one bank occasionally bought less than the full number of CSX shares referenced in the swaps to which it was the counterparty. CSX I, 562 F.Supp.2d at 580 (App. 1, Image 9, Morgan Stanley Holdings of CSX Swaps with TCI and CSX Share Hedges, Nov. 9, 2006, to Jan. 24, 2008).

. 3G’s economic exposure to CSX stock, i.e., actual shares plus CSX-referenced swaps, never exceeded 5 percent. Thus, 3G was able to use a single swap counterparty, Morgan Stanley, without concern that its counterparty’s hedge share purchases would trigger disclosure under the Williams Act.

. Rule 13d-3(a) provides:
For purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:
(1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.
17 C.F.R. § 240.13d-3(a).

. Rule 13d — 3(b) provides:
Any person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose of [szc] effect of divesting such *282 person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act shall be deemed for purposes of such sections to be the beneficial owner of such security.
17 C.F.R. 240.13d-3(b).

. Section 13(d) was part of the 1968 Williams Act's response to the (then) growing use of tender offers to effectuate corporate takeovers, a trend that had “removed a substantial number of corporate control contests from the reach of existing disclosure requirements of the federal securities laws." Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 22, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). In explaining its purpose in enacting section 13(d), Congress used the language of investor protection. See H.R.Rep. No. 90-1711, at 2-3, 1968 U.S.C.C.A.N. 2811, 2812 (1968) ("The public shareholder must, therefore, with severely limited information, decide what course of action he should take.... [N]o matter what he does, he does it without adequate information to enable him to decide rationally what is the best possible course of action. This is precisely the kind of dilemma which our Federal securities laws are designed to prevent.”); see also Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 58, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975) ("The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party.”). Of course, one effect of the Williams Act’s provisions is to alert not only a firm’s shareholders but also the firm’s incumbent management to potential competitors for control of that firm. See James D. Cox, Robert W. Hillman & Donald C. Langevoort, Securities Regulation: Cases and Materials 969 (5th ed. 2006) ("The ostensible statutory purpose is to notify shareholders of the target company of a potential shift in control____But one other beneficiary of the disclosure is quite clear. If it is not already aware of the bidder's activity, target management will take the early warning and begin defensive efforts in earnest.”) (citation omitted).