# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WILMINGTON SAVINGS FUND SOCIETY, FSB, solely in its capacity as successor Indenture Trustee for the 7.875% Senior Notes Due 2021 Issued by FORESIGHT ENERGY LLC AND FORESIGHT ENERGY FINANCE CORPORATION, | : : : : : : : : | |
| Plaintiff, | : : | |
| v. | : : | C.A. No. 11059-VCL |
| FORESIGHT ENERGY LLC, FORESIGHT ENERGY FINANCE CORPORATION, FORESIGHT ENERGY SERVICES LLC, FORESIGHT ENERGY COAL SALES LLC, FORESIGHT SUPPLY COMPANY LLC, HILLSBORO ENERGY LLC, MACOUPIN ENERGY LLC, OENEUS LLC D/B/A SAVATRAN LLC, SUGAR CAMP ENERGY, LLC, WILLIAMSON ENERGY LLC, AMERICAN CENTURY MINERAL LLC, AND AMERICAN CENTURY TRANSPORT LLC, | : : : : : : : : : : : : : : | |
| Defendants. | : : | |

## MEMORANDUM OPINION

Date Submitted: November 17, 2015
Date Decided: December 4, 2015

Martin S. Lessner, James P. Hughes, Jr., Richard J. Thomas, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Daniel A. Ross, Jayme T. Goldstein, Christopher Guhin, STROOCK & STROOCK & LAVAN LLP, New York, New York; Seth H. Lieberman, Patrick Sibley, PRYOR CASHMAN LLP, New York, New York; *Counsel for Plaintiff Wilmington Savings Fund Society, FSB, solely in its capacity as successor trustee for the 7.875% Senior Notes due 2021 issued by Foresight Energy LLC and Foresight Energy Finance Corporation.*

M. Duncan Grant, James H.S. Levine, PEPPER HAMILTON LLP, Wilmington, Delaware; *Counsel for Defendants Foresight Energy LLC, Foresight Energy Finance Corporation, Foresight Energy Services LLC, Foresight Coal Sales LLC, Foresight Supply Company LLC, Hillsboro Energy LLC, Macoupin Energy LLC, Oeneus LLC d/b/a Savatran LLC, Sugar Camp Energy, LLC, Williamson Energy LLC, American Century Mineral LLC, and American Century Transport LLC.*

**LASTER, Vice Chancellor.**

Non-party Foresight Energy, L.P. ("Foresight Parent" or the "Partnership") is the ultimate parent of a family of companies that operate in the coal industry. Foresight Parent raised debt financing by causing two of its subsidiaries to issue senior notes (the "Notes") pursuant to an indenture dated August 23, 2013 (the "Indenture"). Repayment of principal is due in 2021, but if there has been a contractually defined "Change of Control," then the subsidiaries who issued the Notes must offer to redeem them at 101% of par, plus accrued but unpaid interest.

Plaintiff Wilmington Savings Fund Society, FSB currently serves as the trustee under the Indenture (the "Trustee"). The Trustee filed suit, contending that a Change of Control occurred.

The parties cross moved for judgment on the pleadings. The Trustee's motion is granted as to Count I, which asserts that the defendants breached the Indenture by failing to redeem the Notes. The Trustee's motion also is granted as to Count III, which seeks to recover the Trustee's attorneys' fees and expenses. The Trustee's motion is denied as to Count II, which asserts a violation of the implied covenant of good faith and fair dealing. Because the defendants defaulted under the express language of the Indenture, there is no need to consider whether they also breached an implied term. In light of the ruling on Count I, the dispute over Count II is moot. The defendants' cross-motion is denied.

## I.     FACTUAL BACKGROUND

The facts are drawn from the pleadings, their exhibits, and other documents that are integral to or incorporated into the pleadings by reference. This decision has construed the allegations in the light most favorable to the defendants.

## A. Foresight Parent and Its Subsidiaries

Non-party Chris Cline has over thirty years' experience in the coal industry. In 2006, he founded the Foresight family of companies, which own and operate mines in Illinois, Ohio, and West Virginia.

Foresight Parent is a Delaware limited partnership with common units that trade on the New York Stock Exchange. As a Delaware limited partnership, Foresight Parent is governed by the terms of its limited partnership agreement. The currently operative agreement is the First Amended and Restated Agreement of Limited Partnership (the "Parent LP Agreement").

Foresight Parent directly owns defendant Foresight Energy, LLC ("Foresight Energy"). Foresight Energy in turn owns the other entity defendants, including defendant Foresight Energy Finance Corporation ("Foresight Finance"). Together, Foresight Energy and Foresight Finance issued the Notes (the "Issuers"). The remaining entity defendants are operating subsidiaries of Foresight Energy that guaranteed the Issuers' obligations under the Notes.[1] They own the assets that comprise Foresight's coal business.

Foresight Energy GP, LLC (the "General Partner") is a privately held Delaware limited liability company that owns a non-economic general partner interest in Foresight Parent and serves as its general partner. Under the Parent LP Agreement, the General

---

[1] The guarantors are Foresight Energy Services LLC, Foresight Coal Sales LLC, Foresight Supply Company LLC, Hillsboro Energy LLC, Macoupin Energy LLC, Oeneus LLC d/b/a Savatran LLC, Sugar Camp Energy, LLC, Williamson Energy LLC, American Century Mineral LLC, and American Century Transport LLC

Partner controls the business and affairs of Foresight Parent. Through its control over Foresight Parent, the General Partner controls the business and affairs of Foresight Parent's many subsidiaries. The General Partner owns all of Foresight Parent's incentive distribution rights (the "Parent IDRs"), which entitle the General Partner to an increasing share of the distributable cash flow from Foresight Parent after holders of Foresight Parent's common units receive certain minimum distributions.

As a Delaware limited liability company, the General Partner is governed by its operating agreement. Before the events giving rise to this litigation, Foresight Reserves and Michael J. Beyer, the CEO of the General Partner and Foresight Parent, were the sole members of the General Partner. Foresight Reserves owned 99% of the membership interests in the General Partner and Beyer owned the remaining one percent. Cline owned 100% of Foresight Reserves. Through Foresight Reserves, Cline controlled the General Partner, Foresight Parent, and all of its subsidiaries.

B.    The Notes

In 2013, the coal industry faced challenges, including environmental concerns and price competition from other energy sources. Cline saw an opportunity to acquire additional assets at discounted valuations. To finance his planned acquisitions, he caused the Issuers to issue the Notes. The face amount of the Notes is $600 million. Under the Indenture, the Issuers agreed to pay interest quarterly at a rate of 7.875% per annum and repay principal in 2021.

Section 4.11 of the Indenture obligates the Issuers to redeem the Notes at 101% of par in the event that Foresight Parent undergoes a Change of Control. It states:

4

> Not later than 30 days following a Change of Control, the Issuers shall make an Offer to Purchase for all outstanding Notes at a purchase price equal to 101% of the principal amount of the Notes plus accrued and unpaid interest to (but excluding) the date of purchase . . . .

Indenture § 4.11 (the "Redemption Clause").

> The Indenture defines a Change of Control, in pertinent part, as

> the consummation of any transaction (including, without limitation, any merger or consolidation), in one or a series of related transactions, the result of which is that any "person" (as that term is used in Section 13(d)(3) of the [Securities Exchange Act of 1934]), excluding [Cline and his affiliates], becomes the Beneficial Owner, directly or indirectly, of more than 35% of the Voting Stock of [the General Partner], measured by voting power rather than number of shares, units or the like . . . .

Indenture at 10 (the "Change of Control Definition"). The Indenture defines "Voting Stock" as securities that have the power to "vote for the election of" directors or managers of the General Partner, "to control the election of directors or managers" of the General Partner, or simply the power to "control" the General Partner. Indenture at 34. The Indenture defines "Beneficial Owner" as having "the meaning assigned to such term in Rule 13d-3" of the Securities Exchange Act of 1934. *Id.* at 8.

## C.    The Original Deal

Sometime before March 2015, Robert Murray approached Cline about potentially acquiring control of the Foresight family of companies. Murray is the CEO of Murray Energy Corporation, one of the largest coal companies in the United States.

On March 13, 2015, Murray Energy and Foresight Reserves announced that Murray Energy would purchase a controlling stake in Foresight Parent. Murray Energy would pay an aggregate purchase price of $1.395 billion and receive in return (i) an 80%

voting interest in the General Partner, (ii) a 77.5% economic interest in the General Partner, and (iii) a mix of common units and subordinated units in Foresight Parent representing, in the aggregate, not more than a 51% limited partnership interest in Foresight Parent (the "Original Deal").

If the Original Deal had closed, it would have constituted a Change of Control under the Indenture and triggered the Redemption Clause. To avoid having to pay $606 million to redeem the Notes, the Issuers solicited consents from holders of the Notes to waive the Redemption Clause in return for a fee equal to 8% of the face amount of the Notes, or $48 million. Payment of the fee was conditioned on the closing of the Original Deal. Holders of a majority of the Notes gave their consent.

To finance the Original Deal, Murray Energy and Foresight Reserves had to raise approximately $4.8 billion. By early April 2015, it became clear that they would fall short. Pursuant to a Termination Agreement dated April 7, 2015, Murray Energy and Foresight Reserves agreed that they could not raise the necessary financing and terminated the transaction agreements governing the Original Deal. Because the Original Deal was abandoned, the holders of the Notes did not receive a fee for consenting to waive the Redemption Clause.

**D.    The Revised Deal**

Murray Energy and Foresight Reserves subsequently agreed on modified terms for their transaction (the "Revised Deal"). The terms of the Revised Deal are memorialized in a Purchase and Sale Agreement between and among Murray Energy, Foresight Reserves, and Beyer dated April 7, 2015. The Revised Deal closed on April 16, 2015.

6

Under the terms of the Revised Deal, Murray Energy paid $1.37 billion and received in return (i) a 34% voting interest in the General Partner, (ii) a 77.5% economic interest in the General Partner, and (iii) a mix of common units and subordinated units in Foresight Parent representing, in the aggregate, not more than a 51% limited partnership interest in Foresight Parent. In addition, Murray Energy received an option to acquire an additional 46% voting interest in the General Partner for $25 million exercisable at any point during a five-year period (the "GP Option").

The critical difference between the Original Deal and the Revised Deal was that under the latter, Murray Energy only received a 34% voting interest in the General Partner rather than an 80% voting interest. By only acquiring a 34% voting interest in the General Partner, Murray Energy came in just below the 35% figure referenced in the Change of Control Definition, which defines a Change of Control as any person other than Cline or his affiliates becoming "the Beneficial Owner, directly or indirectly, of more than 35% of the Voting Stock of [the General Partner]." The defendants concede that the Revised Deal set Murray Energy's voting interest at 34% and incorporated the GP Option to avoid the 35% ownership threshold.

Through the GP Option, Murray Energy gained the right to pay $25 million to acquire another 46% voting interest in the General Partner, which would result in Murray Energy owning the full 80% voting interest that it would have purchased under the Original Deal. The defendants concede that they structured the terms of the GP Option in an effort to permit Murray Energy to disclaim Beneficial Ownership of the 46% voting

7

interest that is subject to the GP Option. To support that position, Murray Energy and Foresight Reserves built two conditions into the GP Option.

The first condition requires that Murray Energy give Foresight Reserves 61 days advance notice before it can exercise the GP Option (the "Notice Condition"). The drafters of the GP Option chose this time period because Rule 13d-3(d)(1)(i) provides generally that a person may be considered the beneficial owner of a security if that person has the right to acquire the security within 60 days. *See* 17 C.F.R. § 240.13d-3(d)(1)(i). The defendants concede that they picked 61 days to contract around Rule 13d-3(d)(1)(i).

The second condition requires that before Murray Energy can exercise the GP Option, Foresight Parent must have refinanced both the Notes and its outstanding credit on terms "reasonably acceptable to" Foresight Reserves such that the exercise of the GP Option will not cause a Change of Control either for purposes of the Notes or the Foresight Parent's other credit facilities (the "Refinancing Condition"). This condition assists on the Beneficial Ownership front because cases have held that if the fulfillment of a condition lies outside the option holder's control, then the holder does not have the right to acquire the shares until the condition is fulfilled. The Refinancing Condition makes explicit what Murray Energy and Foresight Reserves were trying to accomplish by using the GP Option structure, *viz.,* avoiding a Change of Control.

As part of the Revised Deal, Murray Energy received a number of governance rights under a new operating agreement for the General Partner, officially titled the Second Amended and Restated Limited Liability Company Agreement of Foresight Energy GP LLC (the "New GP Agreement"). The original operating agreement only

8

authorized a single type of member unit. The New GP Agreement split the units in two by authorizing (i) Voting Units, which have the power to vote but do not give the holder an economic interest in the General Partner, and (ii) GP IDR Units, which lack the power to vote but which give the holder an economic interest in the General Partner. The parties agreed on the following ownership table as of the closing of the Revised Deal:

| Member | IDR Units | Voting Units |
|---|---|---|
| Murray Energy | 775,000 | 340,000 |
| Foresight Reserves | 222,750 | 653,400 |
| Beyer | 2,250 | 6,600 |
| Total | 1,000,000 | 1,000,000 |

Section 6.2(a) of the New GP Agreement provides that the business and affairs of the General Partner are governed by a board of directors (the "GP Board"). Section 6.1 provides that GP Board shall have at least three and no more than twelve members. Under Section 6.1(a) the New GP Agreement, Murray Energy has the right to elect "such number of directors as is close as possible to, but not exceeding, its and its Affiliates' proportionate percentage (based on the number of Voting Units outstanding, with a fraction rounded down) of the total number of directors." This decision refers to the directors that Murray Energy appoints as the "Murray Directors." Foresight Reserves has the right to appoint the remaining number of directors.

Section 6.6(d) of the New GP Agreement provides that as long as Murray Energy owns at least 10% of the Voting Units, the General Partner cannot engage in a list of actions without either (i) the prior approval of a Murray Director, for matters that require GP Board approval or (ii) the prior approval of Murray Energy for matters that require

9

member approval (collectively, the "Blocking Rights"). Under Section 6.4(c), a quorum for valid action by the GP Board requires the presence of at least one Murray Director.

The actions covered by the Blocking Rights include:

- Reducing the amount of the Foresight Parent's quarterly distribution.

- Consummating any merger that would result in more than 50% of the Voting Units of the General Partner or 50% of the common units of Foresight Parent being acquired or otherwise beneficially owned by any person other than Murray Energy, Cline, or their affiliates.

- Changing the tax classification of Foresight Parent.

- Issuing additional membership interests of the General Partner or partnership interests in Foresight Parent with rights senior to the common units.

- Proposing amendments to the Parent LP Agreement.

- Selling, assigning, or otherwise disposing of any Parent IDRs.

- Entering into transactions between the General Partner, Foresight Parent, or any of its subsidiaries and Cline that exceed a given threshold.

- Removing, replacing, or diminishing the duties of the General Partner's CEO.

Section 6.6(b) of the New GP Agreement backstops the Blocking Rights by ensuring that certain extraordinary actions require member approval, giving Murray Energy the ability to exercise its Blocking Rights at both the GP Board and member levels. Section 6.6(b) provides that approval of the members is required for "any extraordinary matter that would have, or would reasonably be expected to have, a material effect, directly or indirectly, on the Members' interests in the Company." Under Section 6.6(b), extraordinary matters include, but are not be limited to:

- The commencement of any action relating to bankruptcy or insolvency of the General Partner, Foresight Parent, or a material subsidiary.

10

- A merger, consolidation, recapitalization or similar transaction involving the General Partner, Foresight Parent, or a material subsidiary.

- A sale, exchange, or other transfer not in the ordinary course of business of a substantial portion of the assets of Foresight Parent or a material subsidiary.

- Dissolution or liquidation of the General Partner or Foresight Parent,.

- A material amendment to the Partnership Agreement.

Through the Blocking Rights, Murray Energy obtained the ability to veto—and, hence, control—the fate of transactions falling outside the ordinary course of business at either the General Partner or Foresight Parent. Through other provisions, Murray Energy obtained day-to-day operational control over the General Partner and Foresight Parent. As part of the Revised Deal, Beyer resigned as the CEO of the General Partner and Foresight Parent. He was replaced by Robert Moore, who is the nephew of Robert Murray and who also serves as the CFO and COO of Murray Energy. Because replacing the CEO is one of the extraordinary matters covered by the Blocking Rights, Moore cannot be replaced without Murray Energy's consent.

Relatedly, the General Partner and Murray American Coal, Inc., a wholly-owned subsidiary of Murray Energy, entered into a management services agreement dated April 30, 2015 (the "Management Services Agreement"). Pursuant to Section 3.3(a)(i) of that agreement, Murray American has authority to "manage, administer and oversee all aspects of the operation of [Foresight's coal mining, processing, and transportation facilities], including without limitation, the day-to-day operation, maintenance and business of [those facilities]" through December 31, 2022.

11

Finally, Section 6.6(e)(v) of the New GP Agreement pre-authorizes various categories of related-party transactions between Murray Energy and Foresight Parent. The only requirement for transactions in the covered categories is that "Mr. Moore shall provide prior written notice to the [GP] Board and [Foresight Reserves] of any proposed [related-party transaction] with an estimated dollar value in excess of $10,000,000."

## E. This Litigation

When Foresight Reserves announced the Revised Deal on April 7, 2015, it took the position that the Revised Deal would not result in a Change of Control under the Indenture. Foresight Reserves stated that it therefore would not offer to redeem the Notes. In response to this announcement, holders of a majority of the Notes retained counsel and took the position that the closing of the Revised Deal would constitute a Change of Control and trigger the Redemption Clause.

The Trustee filed this action on May 22, 2015. The defendants answered the Complaint, and the parties cross moved for judgment on the pleadings.

## II. LEGAL ANALYSIS

After the closing of the pleadings, but within such time as not to delay trial, a party may move for judgment on the pleadings. Ct. Ch. R. 12(c). "In determining a motion under Court of Chancery Rule 12(c) for judgment on the pleadings, a trial court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993) (footnote

omitted). "A motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law." *Id.*

## A.     Count I: Breach of Contract

Count I asserts a claim for breach of contract. Under Section 6.01 of the Indenture, "[a]n 'Event of Default' occurs with respect to the Notes if: . . . (3) an Issuer fails to make an Offer to Purchase and thereafter accept and pay for Notes tendered when and as required pursuant to [the Redemption Clause]." Indenture § 6.01 (underlining of defined term omitted). The Redemption Clause is triggered by a Change of Control.

As noted, the Change of Control Definition turns on whether someone other than Cline and his affiliates has become the Beneficial Owner of more than 35% of the Voting Units. The Change of Control Definition incorporates the definition of Beneficial Owner from Rule 13d-3. That definition states, in relevant part:

> (a) . . . [A] beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

> (1) Voting power which includes the power to vote, or to direct the voting of, such security; and or,

> (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

> (b) Any person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose of effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership . . . shall be deemed for purposes of such sections to be the beneficial owner of such security.

> . . . .

13

(d) Notwithstanding the provisions of paragraphs (a) and (c) of this rule:

(1)(i) A person shall be deemed to be the beneficial owner of a security, subject to the provisions of paragraph (b) of this rule, if that person has the right to acquire beneficial ownership of such security, . . . within sixty days, including but not limited to any right to acquire: (A) Through the exercise of any option . . . ; provided, however, any person who acquires a security or power specified in paragraph[] (d)(1)(i)(A) . . . of this section, with the purpose or effect of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having such purpose or effect, immediately upon such acquisition shall be deemed to be the beneficial owner of the securities which may be acquired through the exercise or conversion of such security or power.

17 C.F.R. § 240.13d-3(a)–(d).

The Trustee maintains that Murray Energy qualifies as a Beneficial Owner of 35% or more of the General Partner's Voting Units under four different parts of Rule 13d-3: (a)(1), (a)(2), (b), and (d)(1)(i). The Trustee is right under parts (a)(2) and (b), so there is no need to address whether Murray Energy also is a Beneficial Owner under parts (a)(1) and (d)(1)(i).

### 1.    Rule 13d-3(a)(2): Shared Investment Power

Under Rule 13d-3(a)(2), a Beneficial Owner includes a person who "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares . . . (1) [i]nvestment power which includes the power to dispose, or to direct the disposition of, such security." Under Section 10.4(a) of the New GP Agreement, Foresight Reserves cannot transfer any of its Voting Units in the General Partner to a third party without Murray Energy's consent. The New GP Agreement is a contract, and

Murray Energy therefore "through [a] contract . . . shares . . . the power to dispose" of Foresight Reserves' Voting Units.

According to a leading treatise on the Williams Act, "the investment power clause" in Rule 13d-3(a)(2) "parallels the voting power clause [in Rule 13d-3(a)(1)] with some exactitude. Therefore, our observations regarding the voting power clause can be imported" to the investment power clause. Arnold S. Jacobs, *The Williams Act—Tender Offers and Stock Accumulations* § 2:12 (2015 ed.). The treatise's "observations regarding the voting power clause" include that "a power to veto a vote would be a shared power to vote. Thus, both the person who makes the decision subject to a veto and the person who can exercise the veto power shares the power, and both beneficially own the shares." *Id.* Imported to the investment power clause, the power to veto a transfer of shares is a shared power to transfer. The person who makes the initial decision to transfer and the person who can exercise a veto over that decision share the power to transfer, so both beneficially own the shares.

Consistent with the treatise, the SEC has expressed its view in a no-action letter that a veto power over the disposition of shares may confer beneficial ownership over the shares for purposes of Rule 13d-3(a)(2). *See BankAmerica Capital Corp.*, SEC No-Action Letter, 1979 WL 13099 (Apr. 6 1979). The no-action letter is not binding precedent, but it provides additional persuasive authority.

Section 10.4(a) of the New GP Agreement states, in pertinent part:

> [N]o Member may directly or indirectly transfer any of his/her/its Voting Units or IDR Units in [the General Partner] to a non-Member without the express written consent of [Murray Energy] and [Foresight Reserves],

15

which consent may be withheld in [Murray Energy's] and/or [Foresight Reserves'] sole and absolute discretion, except for any Permitted Transfer.

As is customary, a Permitted Transfer is defined under Section 10.4(b) to include transfers to an affiliate or for purposes of estate planning. As to other transfers of Voting Units, Foresight Reserves only can dispose of its Voting Units if Murray Energy gives consent, which Murray Energy can withhold in its "sole and absolute discretion."

New York law governs the Indenture. *See* Indenture § 12.08. Under New York law, "courts ordinarily to give the words and phrases employed their plain and commonly-accepted meanings." *Law Debenture Tr. Co. of N.Y. v. Petrohawk Energy Corp.*, 2007 WL 2248150, at *6 (Del. Ch. Aug. 1, 2007) (Strine, V.C.) (citing *Laba v. Carey,* 29 N.Y.2d 302, 308 (N.Y. 1971)). Under the plain language of Rule 13d-3(a)(2) and the New GP Agreement, Murray Energy's veto right over Foresight Reserves' ability to transfer its Voting Units makes Murray Energy the Beneficial Owner of the Voting Units owned by Foresight Reserves. Murray Energy, therefore, is the Beneficial Owner of both the 34% voting interest represented by its Voting Units and the 66% voting interest held by Foresight Reserves.

In an attempt to avoid this outcome, the defendants rely on the word "the." According to the defendants, the Indenture excluded the possibility of shared Beneficial Ownership by stating that a Change of Control only would occur if a person other than Foresight Reserves became "the Beneficial Owner" of more than 35% of the Voting Units in the General Partner. In other words, despite incorporating a definition which contemplated that Beneficial Ownership could arise through shared control, the Indenture

16

overrode those concepts by using the definite article "the" rather than the indefinite article "a." In support of this reading, the defendants rely on a decision in which this court observed that, in general usage, "placing the article 'the' in front of a word connotes the singularity of the word, whereas using 'a' implies that the modified noun is but one of several of that kind." *ION Geophysical Corp. v. Fletcher Int'l, Ltd.*, 2010 WL 4378400, at *8 (Del. Ch. Nov. 5, 2010).

Rejecting the defendants' argument threatens no violence to the general principle correctly identified in *ION Geophysical*. Under the plain language of Rule 13d-3, a person can become "the" Beneficial Owner of 35% or more of the Voting Units through shared control, and that singular person remains "the" Beneficial Owner of 35% or more of the Voting Units even if another person also is or becomes "the" Beneficial Owner of 35% or more of the Voting Units.

This interpretation comports with how the SEC itself applies Rule 13d-3. For example, Item 403(a) of Regulation S-K requires that a registrant provide the following information:

> (a) *Security ownership of certain beneficial owners.* Furnish the following information . . . with respect to any person . . . who is known to the registrant to be *the beneficial owner* of more than five percent of any class of the registrant's voting securities.
>
> . . . .
>
> 2. For the purposes of this Item, beneficial ownership shall be determined in accordance with Rule 13d-3 under the Exchange Act (§240.13d-3 of this chapter). Include . . . amounts as to which *the beneficial owner* has (A) sole voting power, (B) *shared voting power*, (C) sole investment power, or (D) *shared investment power*.

17 C.F.R. § 229.403 (emphasis added). As used in Item 403(a), the term "the beneficial owner" includes both "shared voting power" and "shared investment power." It thus uses the term "the beneficial owner" despite the possibility that there could be multiple beneficial owners.

The same is true in ordinary English. A person may be called "the owner," even if that person is not necessarily "the sole owner." George Steinbrenner was often referred to as "the owner" of the New York Yankees, when in fact he was one of the owners. *See Parks v. Steinbrenner*, 131 A.D.2d 60, 61-62 (N.Y. App. Div. 1st Dep't 1987) (describing Steinbrenner as "the owner of an embattled team" while acknowledging that he was the principal owner rather than the exclusive owner).

Ultimately, "the essence of proper contract interpretation" under New York law is "to enforce a contract in accordance with the true expectations of the parties in light of the circumstances existing at the time of the formation of the contract." *Reiss v. Fin. Performance Corp.*, 279 A.D.2d 13, 19 (N.Y. App. Div. 1st Dep't 2000). As counsel to the defendants recognized at oral argument, "the underlying purpose of the [Change of Control Definition] is for the noteholders to be assured that Mr. Cline is basically in charge." Dkt. 64 at 15. By any reasonable reading of the New GP Agreement, Cline is no longer basically in charge. Murray Energy is now basically in charge.

After taking into account the underlying purpose of the Change of Control Definition, the text and application of Rule 13d-3, and the plain meaning of the Indenture, it is not possible to interpret the use of the definite article "the" before the term Beneficial Owner as excluding shared control. Murray Energy's veto right over Foresight

18

Reserves' ability to transfer its Voting Units makes Murray Energy the Beneficial Owner of the Voting Units owned by Foresight Reserves.

### 2. Rule 13d-3(b): The Anti-Evasion Language

The parties debated at length in their briefs whether Murray Energy is the Beneficial Owner of the Voting Units that it has the right to acquire under the GP Option. As discussed in the Factual Background, the defendants admit that Murray Energy and Foresight Reserves sought to contract around the ownership triggers in Rule 13d-3 by incorporating the Notice Condition and the Refinancing Condition. The Notice Condition uses 61 days rather than 60 days as the relevant time period because, generally speaking, a person is only considered the beneficial owner of a security if that person has the right to acquire the security through the exercise of an option within 60 days. 17 C.F.R. § 240.13d-3(d)(1)(i). The Refinancing Condition requires that any refinancing must be "reasonably acceptable to" Foresight Reserves because cases have held that if a condition is outside the option holder's control, then the option holder lacks the power to acquire the shares until the condition is met. *See, e.g.*, *Transcon Lines v. A.G. Becker, Inc*., 470 F. Supp. 356, 370-71 (S.D.N.Y. 1979) (holding that a party's right to acquire a security did not make that party the beneficial owner of the security because such a right was contingent on the occurrence of external events).

In the abstract, efforts to structure a transaction to avoid tripping the terms of an indenture are perfectly permissible. "Issuers of corporate debt do not breach their contractual obligations by structuring transactions to avoid triggering a mandatory

redemption provision in favor of Noteholders."[2] But contract drafters can respond. In an ever-evolving contractual arms race, sophisticated parties can anticipate efforts to evade the terms of an agreement. One means of responding is by expanding the literal terms. Another is through provisions triggered by efforts to evade the literal terms.

In this case, the drafters of the Indenture chose a definition of Beneficial Owner that contains anti-evasion language. Rule 13d-3(b) provides, in relevant part:

> Any person who, directly or indirectly, creates or uses a . . . contract, arrangement, or device with the purpose or effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership . . . shall be deemed . . . to be the beneficial owner of such security.

17 C.F.R. § 240.13d-3(b). At oral argument, and consistent with the plain language of the Indenture, the defendants' counsel agreed that the definition of Beneficial Owner in the Indenture incorporated the anti-evasion aspects of Rule 13d-3. *See* Dkt. 64 at 22.

The defendants concede that they carefully attempted to evade the Change of Control Definition. In their opening brief, they stated: "The parties to the Option Agreement structured the option exercise period carefully to avoid running afoul of the beneficial ownership requirements of Rule 13d-3 . . . ." Dkt. 42 at 33. At the same time, they took steps to vest Murray Energy with practical control over the General Partner,

_____

[2] *Law Debenture Trust*, 2007 WL 2248150, at \*7; *accord Concord Real Estate CDO 2006-1, Ltd. v. Bank of Am. N.A.*, 996 A.2d 324, at 339 (Del. Ch. 2010); *see Mangano v. Pericor Therapeutics, Inc.*, 2009 WL 4345149, at \*5 & n.49 (Del. Ch. Dec. 1, 2009) (noting that the Court will not redraft a contract because one of the parties structured a transaction through a "loophole" in contractual language that the parties could have addressed).

both in terms of extraordinary transactions, where the Blocking Rights apply, and ordinary course of business operations, where Murray Energy runs the show through Moore and the Management Services Agreement. For purposes of the Change of Control Definition, this is sufficient to trigger the anti-evasion aspect of Rule 13d-3(b).

The pricing of the Revised Deal reflects the fact that Murray Energy acquired *de facto* control. In the Original Deal, Murray Energy would have paid $1.395 billion to acquire a package of securities that included 80% of Voting Units. In the Revised Deal, Murray Energy paid $1.37 billion to acquire the same package of securities, but only 34% of the Voting Units. The exercise price for the GP Option is $25 million, reflecting the difference in the purchase price. If Murray Energy truly did not gain control over the General Partner and Foresight Parent in the Revised Deal, then it means that Cline, a savvy businessman with over 30 years' experience in the coal industry, extracted a control premium in the Original Deal of just 1.8%. That is preposterous.[3] In fact, Murray

---

[3] In contrast to the purported 1.8% control premium, a number of studies have found that control premia in mergers and acquisitions typically range between 30 and 50%. *See, e.g.*, FactSet Mergerstat, *Control Premium Study 1st Quarter 2012* 2 (2012) (finding 12-month median control premia of between 34 and 44% for each quarter from the first quarter of 2009 until the first quarter of 2012), http://www.bvmarketdata.com/pdf/CPS1q12Sample.pdf; Jens Kengelbach & Alexander Roos, The Boston Consulting Group, *Riding the Next Wave in M&A: Where Are the Opportunities to Create Value?* 10 (2011) (finding an average acquisition premium of 36% in mergers and acquisitions from 2008 to 2011), https://www.bcg.com/documents/file78141.pdf; G. William Schwert, *Markup Pricing in Mergers and Acquisitions*, 41 J. Fin. Econ., 153, 162 (1996) (finding an average control premium of 37% for successful mergers and acquisitions between 1975 and 1991).

Energy received *de facto* control in the Revised Deal, which is why it paid virtually the same amount as in the Original Deal.

It follows that Murray Energy and the defendants (as they admit) sought to "use[] a . . . contract . . . with the purpose or effect of preventing the vesting of such beneficial ownership." 17 C.F.R. § 240.13d-3(b). Under Rule 13d-3(b), Murray Energy is therefore "deemed . . . to be the beneficial owner of such security." *Id.*

To avoid this result, the defendants rely on a concurring opinion in a case that addressed the disclosure obligations of a Schedule 13D filer and construed the requirements of Rule 13d-3(b) in that context. *See CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276 (2d Cir. 2011) (Winter, J., concurring). Recognizing that Rule 13d as a whole is designed to prevent the accumulation of concealed positions, Judge Winter observed in his concurrence in *CSX* that for Rule 13d-3(b) to apply, "the transaction must include a component that provides a substantial equivalence of the rights of ownership relevant to control, or include steps that stop short of, or conceal, the vesting of ownership, while nevertheless ensuring that such ownership will vest at the signal of the would-be owner." *Id.* at 305. The defendants correctly observe that the Revised Deal made no effort to conceal the GP Option or the terms of the New GP Agreement. In my view, Judge Winter's judicial gloss on Rule 13d as requiring an element of concealment makes perfect sense for purposes of that regulation. But when the drafters of the Indenture incorporated the concept of Beneficial Ownership into the Change of Control Definition, I do not believe that they were concerned about concealment. As the parties agree, they were concerned with whether anyone other than

Cline gained the ability to influence the Foresight family of companies. The Change of Control Definition, when read as part of the Indenture as a whole, does not incorporate any concealment requirement.

Under the anti-evasion language of Rule 13d-3(b), which the Indenture incorporates by reference in the Change of Control Definition, Murray Energy is the Beneficial Owner of the Voting Units that are subject to the GP Option. The Revised Deal therefore caused a Change of Control within the meaning of the Indenture.

### 3.     An Event of Default Occurred

A Change of Control occurred on April 16, 2015, when the Revised Deal closed. Under the Redemption Clause, the Issuers had to offer to redeem the Notes within 30 days. They failed to do so, giving rise to an Event of Default. Under Section 6.01(3), the Trustee is entitled to an order compelling the Issuers to perform their obligations under the Redemption Clause.

## B.     Count II: Breach Of The Implied Covenant

Count II asserts a claim for breach of the implied covenant of good faith and fair dealing. Because of the ruling on Count I, there is no need to reach this claim. The Trustee is entitled to relief under the express language of the Indenture, rendering it unnecessary to consider implied obligations. Count II is moot.

## C.     Count III: Indemnification

Count III seeks indemnification for the Trustee's reasonable costs and expenses, including attorneys' fees. Section 7.07 of the Indenture states:

The Issuers, jointly and severally, failing which each Guarantor, jointly and severally, shall reimburse the Trustee upon request for all reasonable out-of-pocket expenses incurred or made by it . . . . Such expenses shall include the reasonable compensation and out-of-pocket expenses of the Trustee's agents and counsel.

The Issuers, jointly and severally, failing which each Guarantor, jointly and severally, shall indemnify the Trustee . . . and hold it and them harmless from and against any . . . expense (including attorneys' fees and expenses) incurred by it or any of them arising out of or in connection with the administration of this trust and the acceptance or performance of any of its powers or duties hereunder . . . (including the costs and expenses of enforcing this Indenture including this Section 7.07) . . . . The Issuers shall not reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee through the Trustee's own willful misconduct or negligence.

Indenture § 7.07. The Trustee brought this action to enforce the Redemption Clause. There are no allegations that its costs and expenses resulted from its own willful misconduct or negligence. Under Section 7.07, the Trustee is entitled to its reasonable costs and expenses, including attorneys' fees.

This decision decides only the issue of liability. It does not establish the specific amount of reasonable costs and expenses, including attorneys' fees, to which the Trustee is entitled.

### III. CONCLUSION

The Trustee's motion for judgment on the pleadings is granted as to Counts I and III. Count II is moot. The defendants' motion for judgment on the pleadings is denied. The parties shall meet and confer regarding the amount of the Trustee's reasonable costs and expenses. If they cannot agree, the Trustee shall make an application.