[No. 9674.   Department One. — May 21, 1887.]

THOMAS FURLONG ET AL., RESPONDENTS, v. HANNAH COONEY ET AL., APPELLANTS.

ADVERSE POSSESSION — TITLE ACQUIRED BY — OFFER BY ADVERSE POSSESSOR TO BUY PAPER TITLE. — After the title to certain land has been acquired by adverse possession, an offer made by the adverse possessor to the holder of the paper title, to buy whatever rights he has in the land for the purpose of avoiding a lawsuit, is not an admission that the title of the latter is good, nor does it invalidate the title acquired by the adverse possession.

EJECTMENT — DAMAGES TO OTHER LANDS CANNOT BE RECOVERED. — In an action to recover the possession of certain specific real property, with damages for the withholding thereof, the plaintiff is not entitled to recover and cannot join a cause of action for damages done to other land belonging to him.

APPEAL from a judgment of the Superior Court of the city and county of San Francisco, and from an order refusing a new trial.

The facts are stated in the opinion.

*M. Cooney*, for Appellants.

*B. McKinne*, and *Eugene N. Deuprey*, for Respondents.

BELCHER, C. C.—The controversy in this case is about a strip of land sixty-eight feet nine inches long and from four to thirteen inches wide. The strip is a part of fifty-vara lot No. 186, which is situated on the side of Telegraph Hill, in the city of San Francisco, and is bounded on the north by Union Street, and on the west by Montgomery Street. The plaintiffs claim title to the strip under an alcalde grant of the lot, and through sundry mesne conveyances from the grantee, and the defendants claim title to it under the statute of limitations. The case was tried before a jury, and the plaintiffs recovered a verdict, on which judgment was entered for the possession of the strip in question, and damages in the sum of three hundred dollars for the withholding thereof. The defendants moved for a new trial, and now prosecute this appeal from the judgment and an order denying their motion.

The material facts of the case, as disclosed by the evidence, are as follows:—

In 1850, John J. Cooney, the husband of the defendant Hannah Cooney, became the owner of a part of lot 186, bounded on the north by Union Street, and extending back southerly sixty-eight and three fourths feet, and having its western line parallel with Montgomery Street, and distant therefrom sixty-eight and three fourths feet. In 1851, Cooney had his lot surveyed out, and then built a two-story house thereon. The house faced on Union Street, and from its southwest corner he built a fence back to his rear line, and then around, so that with the house the lot was wholly inclosed. Subsequently he built a one-story dining-room and kitchen at the end of his house, leaving then about fifteen feet of the rear portion of his lot uncovered by buildings. The west line

of the dining-room and kitchen was four inches farther west than the corresponding line of the main house, and the roof extended out five inches farther. From the time of its construction until his death, in 1879, Cooney resided with his family continuously in this house, and since his death his widow has resided in it. During all the time of his residence there Cooney claimed to own all the land covered by his buildings and improvements, and, so far as appears, his ownership was never questioned or disputed until 1876, when the plaintiffs became the owners of the lot lying west of and adjacent to his property.

A few years after Cooney erected his house, one O'Connor built a two-story house on the lot now owned by the plaintiffs, placing it back from Union Street, so that the front line of it was only a few inches north of the rear line of Cooney's main building. Prior to 1876 that lot was owned and occupied by several different parties, one of whom, E. B. Mastick, was called as a witness for the plaintiffs, and he was the only one of them called by either side. He testified that he knew the lot from 1853 to 1864, and that he bought it and was in the use of it for five or six years, and built a barn there. " I never had the place surveyed. I supposed that the Cooney houses were east of my easterly line,—the easterly line of this land in controversy. No question arose about it when I lived there. When I bought the lot, Mr. Cooney's buildings were standing on the west line of his lot, where they stood during all the years I was there. We never had any dispute about our lines of land. They were good neighbors. Mr. Cooney's house was, I think, a two-story in front and one-story in rear, and a high board fence extended from his kitchen to the rear of the lot south. It was all inclosed. It was in that way all the time I was there." And on cross-examination he said: " When I bought my lot I saw the Cooney buildings and fence there. ˙ Mr. Cooney occupied these prem-

ises and buildings with his family from 1853 to 1864. To my own knowledge, he was in actual possession of the ground all that time. I never disturbed him, nor did he disturb me. The house now called Furlong House formed the inclosure on the east, and the Cooney fence was to the rear. *Question.* Did you during all that period, from 1853 to 1864, acquiesce in the possession by John J. Cooney of all this land inclosed and built upon by him? *Answer.* Yes, sir; I never knew of their being beyond the line."

The defendant Hannah Cooney was called as a witness for defendants, and testified, among other things, that she began to live on the lot in 1850, and had resided there ever since. " My husband and family occupied the land and premises, upon which our buildings and fences now stand, since 1850 to the time of his death, continuously, without any interruption by anybody until Mr. Furlong interfered with us. . . . . He did not hold this strip of land under anybody. He claimed it in his own right. He occupied it as his home and for his family during all those years, and he held it as his own. . . . . Mr. O'Connor built this Furlong House where it stands. The eaves of my kitchen and the main house were just the same when he built his house as they are now. . . . . We did not know we were off our line, and did not know until after survey made in June, 1876. . . . . I believe my husband had a survey made in early times, —I think it was in 1851,—and according to the survey, we built our house there. I recollect his making a survey. We lived on this property before we put up our building. We had a tent there before that."

Another witness was called for defendants, who had owned and lived upon the lot adjoining on the south the Cooney and Furlong lots for about thirty years. He testified that he had known these lots since 1851, and as to the times when and the persons by whom the improvements thereon were erected and occupied, and then said:

" I never heard any of the former owners of the Furlong
lot dispute Mr. Cooney's right to occupy this land upon
which his buildings stood. I never heard any one dis-
pute Mr. Cooney's right to occupy the land in dispute,
and upon which his buildings have stood since 1851.
Hudson occupied the adjoining lot at one time as owner.
He never disputed Cooney's right to it. His right to it
was never questioned by the owners before Furlong. I
never heard any controversy between them,— Cooney
and Furlong's predecessors,— as to this boundary line.
There never was any claim made, to my knowledge, by
any owner before Furlong, for anything east of the Fur-
long House; they never claimed east of that. Mr. Cooney
always, since 1851 to the time of his death, claimed all
the land, upon which his buildings stand, to be his prop-
erty." And on cross-examination he said: "I did hear
Mr. Cooney speak of this property; of course I did. He
said he owned it. He claimed it all, because he had
a survey made in 1850 or 1851. When he built his
house he told me so. When I bought my lot he told me
that the lot was his lot. I never heard him say any-
thing about thirteen inches of land on Furlong lot. He
did not know that he was on the Furlong lot."

In June, 1876, after the plaintiffs purchased their lot,
they had it surveyed, and then for the first time dis-
covered that Cooney's main building extended over their
line four inches, his dining-room and kitchen eight
inches, the roof reaching out five inches still farther,
and that the fence in the rear was over the line four
inches. Thomas Furlong, one of the plaintiffs, testified
that after making this discovery he at once notified
Cooney of it, and that, after looking at the surveyor's
lines and conversing upon the subject for about an hour,
Cooney said he " did not want any man's land, and that
he would fix it, and would pay whatever the land was
worth,— the value he would leave to arbitration. . . . .
He told me in June, 1876, if he had any land belonging

to anybody he would leave it to arbitration; he would rather compromise than have any trouble." And in July, 1879, " he made the proposition to me to purchase the strip of land upon which his buildings encroached. . . . . He said he did not desire to go to law; that he wanted to settle matters. . . . . He then told me he had so much trouble about the land that he would rather fix it in some way. He said his buildings were upon it, and he supposed he was on his own land." The witness further testified that the first intimation Cooney ever gave him that he claimed any adverse interest in this strip of land was in February, 1877, and from that time until July, 1879, he was not on friendly terms with Cooney. Mrs. Furlong testified that she heard the conversation in July, 1879, and that her " husband then told him that he was on a part of our land, and he [Mr. Cooney] seemed surprised. He said he was willing to leave it to arbitration; but nothing was ever done about it."

1. The action was commenced in April, 1881, and the first question is, Did John J. Cooney acquire title to the demanded premises by adverse possession, under the operation of the statute of limitations? It is, of course, settled law that, to constitute an adverse possession of land so as to set and keep the statute of limitations in motion, the occupation of the one claiming to hold adversely must be open, visible, notorious, and exclusive, and must be retained under a claim of right to hold against the owner, and the owner must have knowledge, or the means of knowledge, of such occupation and claim of right. (*Thompson* v. *Pioche*, 44 Cal. 508; *Thompson* v. *Felton*, 54 Cal. 547.) Here the testimony shows, without conflict, that Cooney's occupation of the strip of land in controversy met all these requirements. For twenty-five years his occupation of it was open, visible, notorious, and exclusive. He claimed it, too, as his own during all that time, and the true owners had knowl-

edge, or the means of knowledge, of his occupation and claim.

But it is urged on behalf of respondents that Cooney's statements made to Furlong in June, 1876, and July, 1879, were, in effect, admissions that plaintiffs' title was good, and that he had not so claimed and occupied the property as to give him any right or title thereto under the statute.    We do not think the statements referred to can have the effect claimed for them.    They only show that he did not want any trouble or suit about the matter, and was willing to buy his peace.    By his adverse occupancy he had already become invested with a perfect title, which could only be divested by a conveyance or an adverse occupancy against him for five years; and by offering to buy out the plaintiffs' claim of title, he did not thereby make good their title, or in any way render invalid his own title.    (*Arrington* v. *Liscom*, 34 Cal. 365; S. C., 94 Am. Dec. 722; *Cannon* v. *Stockmon*, 36 Cal. 535; S. C., 95 Am. Dec. 205.)

In both these cases, it was held that an adverse possession of land for the period prescribed by the statute of limitations not only bars the remedy, but practically extinguishes the right of the party having the true paper title, and vests a perfect title in the adverse holder.    And in the last case an instruction in the following words was asked by the defendant, and refused: "A party in possession of premises, claiming to own the same, may buy his peace by purchasing any outstanding title or claim of title without admitting such title or claim of title to be valid."    Of this the court said: "We have no doubt that the instruction refused correctly states the law on the point.    A party may very well deny the validity of an adverse claim or title, and yet choose to buy his peace at a small price rather than be at great expense and annoyance in litigating it.    And such is, doubtless, often the wiser course.    It is notorious that, in the confusion of titles to land in this state, it is a matter of every-day ex-

perience to buy up, not one only, but many adverse claims, even where the party buying believes he has, and actually has, the better title.    To adopt any other principle than that embraced in the instruction refused would, in this state, be to deprive a very large portion of the holders of real estate, if not all of them, who stand in need of it, of all benefit of the statute of limitations.    A party is not bound to admit, and does not necessarily admit, title in another, because he prefers to get rid of that other's claim by purchasing it.    He has a right to quiet his possession, and protect himself from litigation, in any lawful mode that appears to him most advantageous or desirable."

2. The only other question which need be considered relates to the damages awarded the plaintiffs.    In their complaint, the plaintiffs alleged that the value of the rents and profits of the property sued for was one dollar per month, and for this they prayed judgment in the sum of forty-nine dollars.    They also alleged that they had been damaged by the withholding of the property in the sum of five thousand dollars, and for this they prayed judgment.    The answer denied that the value of the rents and profits was any sum greater than twenty cents per month, and denied that the plaintiffs had been damaged by the withholding of the property in the sum of five thousand dollars, or in any sum whatever.    No proof was offered as to the value of the rents and profits, but it was attempted to be shown that the plaintiffs' house on their adjacent land had been damaged very considerably by the obstruction by defendants of its lights, etc.    Under our code the plaintiff may unite in the same complaint a claim to recover specific real property with damages for the withholding thereof, or for waste committed thereon, and the rents and profits of the same.    (Code Civ. Proc, sec. 427.)    The measure of damages caused by the wrongful occupation of real property in a case like this is deemed to be the value of the use of

the property for the time of such occupation, not exceeding five years next preceding the commencement of the action, and the costs, if any, of recovering the possession. Interest may also be allowed when necessary to a complete indemnity. (Civ. Code, secs. 3287, 3334; *Haggin* v. *Clark,* 51 Cal. 112; *Vandervoort* v. *Gould,* 36 N. Y. 646.)

But a claim for damages done by the defendants to other lands or property of the plaintiffs cannot be joined in an action like this. If such damages have been sustained, they must be sued for separately. Here the damages given the plaintiffs were clearly in excess of the value of the use of the demanded premises for five years before the action was brought, with interest thereon; and besides, they were admittedly for injuries done to other property.

It follows, in our opinion, that the judgment and order should be reversed, and the cause remanded for a new trial.

Searls, C., and Foote, C., concurred.

. The Court. — For the reasons given in the foregoing opinion, the judgment and order are reversed, and cause remanded for a new trial.