14-3800-cv
Lowinger v. Morgan Stanley

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2014

(Argued: May 15, 2015            Decided: November 3, 2016)

Docket No. 14-3800-cv

- - - - - -  - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ROBERT LOWINGER,

        <u>Plaintiff-Appellant</u>,

THOMAS E. NELSON, individually and on behalf of all others similarly situated, ROCK SOUTHWARD, derivatively on behalf of himself and all others similarly situated, AVATAR SECURITIES, LLC, MEREDITH BAILEY, on behalf of themselves and all others similarly situated, DMITRI BOUGAKOV, on behalf of themselves and all others similarly situated, RYAN CEFALU, on behalf of themselves and all others similarly situated, LORRAIN CHIN, FIRST NEW YORK SECURITIES L.L.C., ATISH GANDHI, on behalf of themselves and all others similarly situated, PHILLIP GOLDBERG, on behalf of themselves and all others similarly situated, ERIC HAMRICK, on behalf of themselves and all others similarly situated, STEVE JARVIS, JOE JOHNSON, on behalf of themselves and all others similarly situated, NUHKET KAYAHAN, on behalf of themselves and all others similarly situated, DAVID KENTON, on behalf of themselves and all others similarly situated, DENNIS KUHN, on behalf of themselves and all others similarly situated, BENJAMIN LEVINE, on behalf of themselves and all others similarly situated, KATHERINE LOIACONO, on behalf of themselves and all others similarly situated, CRYSTAL MCMAHON, on behalf of themselves and all others similarly situated, GEORGE MICHALITSIANOS, on behalf of themselves and all others similarly situated, RANDY TERESA MIELKE, on behalf of themselves and all others similarly situated, JACINTO RIVERA, on behalf of themselves and all others similarly situated, FAISAL SAMI, on behalf of themselves and all others similarly situated, SANJEEV SHARMA, on behalf of themselves and all others similarly situated, COLIN SUZMAN, on behalf of themselves and all others similarly situated, T3 TRADING GROUP, LLC, VIJAY AKKARAJU, ALEXIS ALEXANDER, as custodian for Chloe Sophie Alexander, BRIAN ROFFE PROFIT SHARING PLAN, individually and on behalf of all others

similarly situated, JOSE GALVAN, MARY GALVAN, ROBERT HERPST, individually and on behalf of all others similarly situated, SANJAY ISRANI, on behalf of themselves and all others similarly situated, KBC ASSET MANAGEMENT N.V., and the EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT OF THE VIRGIN ISLANDS (Collectively, the INSTITUTIONAL INVESTORS), DOUGLAS M. LIGHTMAN, individually and on behalf of all others similarly situated, DENNIS PALKON, individually and on behalf of all others similarly situated, RICK POND, JACOB SALZMANN, individually and on behalf of all others similarly situated, MICHAEL SPATZ, MAREN TWINING, individually and on behalf of all others similarly situated, GOLDRICH COUSINS P.C. 401(k) PROFIT SHARING PLAN & TRUST, IRVING S. BRAUN, individually, EDWARD CHILDS, derivately on behalf of himself and all others similarly situated, KATHY REICHENBAUM, individually and on behalf of all others similarly situated, JUN YAN, on behalf of herself and all others similarly situated, ELBITA ALFONSO, VICKY JONES, PHYLLIS PETERSON, JERRY RAYBORN, on behalf of themselves and all others similarly situated, EDWARD VERNOFF, JUSTIN F. LAZARD, on behalf of himself and all others similarly situated, SYLVIA GREGORCYZK, on behalf of herself and all others similarly situated, PETER BRINCKERHOFF, GARRETT GARRISON, DAVID GOLDBER, individually and on behalf of all others similarly situated, KEVIN HYMS, individually and on behalf of all others similarly situated, RICHARD P. EANNARINO, individually and on behalf of all others similarly situated, PETER MAMULA, individually and on behalf of all others similarly situated, KHODAYAR AMIN, on behalf of himself and all others similarly situated, ELLIOT LEITNER, individually and on behalf of all others similarly situated, BARBARA STEINMAN, on behalf of herself and all others similarly situated, HOWARD SAVITT, on behalf of himself and all others similarly situated, CHAD RODERICK, EUGENE STRICKER, individually and on behalf of all others similarly situated, STEVE SEXTON, individually and on behalf of all others similarly situated, KEITH WISE, individually and on behalf of all others similarly situated, JONATHAN R. SIMON, JAMES CHANG, individually and on behalf of all others similarly situated, SAMEER ANSARI, individually and on behalf of all others similarly situated, DARRYL LAZAR, individually and on behalf of all others similarly situated, MICHAEL LIEBER, individually and on behalf of other similarly situated, THOMAS J. AHRENDTSEN, AARON M. LEVINE, individually and on behalf of all others similarly situated, KAREN CUKER, individually and on behalf of all others similarly situated, BRIAN GRALNICK, individually and on behalf of all others similarly situated, JENNIFER STOKES, individually and on behalf of all others similarly situated, VERNON R. DeMOIS, Jr., individually and on behalf of all others similarly situated, HAL HUBUSCHMAN, derivately on behalf of Facebook, Inc., EDWARD SHIERRY, individually and on behalf of all others similarly

situated, JANIS FLEMING, WILLIAM COLE, derivatively on behalf of Facebook, Inc., STEVE GRIFFIS, HOLLY McCONNAUGHEY, derivatively on behalf of Facebook Inc., GAYE JONES, derivatively on behalf of Facebook Inc., LIDIA LEVY, on behalf of herself and all others similarly situated,

Plaintiffs,

v.

MORGAN STANLEY & CO. LLC, J.P. MORGAN SECURITIES LLC, GOLDMAN SACHS & CO., and FACEBOOK, INC., a Delaware corporation,

Defendants-Appellees,

BARCLAYS CAPITAL INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, ERSKINE B. BOWLES, JAMES W. BREYER, DAVID SPILLANE, DAVID A. EBERSMAN, ALLEN & COMPANY LLC, BMO CAPITAL MARKETS CORP., BLAYLOCK ROBERT VAN LLC, DONALD E. GRAHAM, C.L. KING & ASSOCIATES, INC., REED HASTINGS, CABRERA CAPITAL MARKETS, LLC, CASTLEOAK SECURITIES, L.P., PETER A. THIEL, CITIGROUP GLOBAL MARKET, INC., MARK E. ZUCKERBERG, COWEN AND COMPANY, LLC, CREDIT SUISSE SECURITES (USA) LLC, SHERYL K. SANDBERG, DEUTSCHE BANK SECURITIES INC., CIPORA HERMAN, E TRADE SECURITIES LLC, ITAU BBA USA SECURITIES, INC., LAZARD CAPITAL MARKETS LLC, LEBENTHAL & CO., LLC, LOOP CAPITAL MARKETS LLC, M.R. BEAL & COMPANY, MACQUARIE CAPITAL (USA) INC., MURIEL SIEBERT & CO., INC., OPPENHEIMER & CO., INCORPORATED, PACIFIC CREST SECURITIES LLC, PIPER JAFFRAY & CO., RBC CAPITAL MARKETS, LLC, RAYMOND JAMES & ASSOCIATES, INC., SAMUEL A. RAMIREZ & COMPANY, INC., STIFEL, NICOLAUS & COMPANY, INC., THE WILLIAMS CAPITAL GROUP, L.P., WELLS FARGO SECURITIES, LLC, WILLIAM BLAIR & COMPANY, L.L.C., NASDAQOMX GROUP, INCORPORATED, LAWRENCE CORNECK, individually and on behalf of all others similarly situated, JILL D. SIMON, CITIGROUP GLOBAL MARKETS INC., ALLEN & FACEBOOK (sic) LLC, WILLIAM BLAIR & FACEBOOK (sic) LLC, M.R. BEAL & FACEBOOK (sic) INCORPORATED, COWEN AND FACEBOOK (sic) LLC, STIFEL NICHOLAS & FACEBOOK (sic) INCORPORATED, SAMUEL A. RAMIREZ & FACEBOOK (sic) INC, KEVIN HICKS, individually and on behalf of all others similarly situated, LINH LUU, individually and on behalf of all others similarly situated, HARVEY LAPIN, individually and on behalf of all others similarly situated, KING & ASSOCIATES, INC., DAVID E. (sic) EBERSMAN, NICK E. TRAN, THE NASDAQ STOCK MARKET L.L.C., a Foreign Limited Liability Company, NASDAQ STOCK MARKET,

INCORPORATED, NASDAQ OMX GROUP, INCORPORATED, UMA M. SWAMINATHAN, ROBERT GREIFELD, ANNA M. EWING, MARC L. ANDREESSEN,

Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:  WINTER, LOHIER, and CARNEY, Circuit Judges.

Appeal from a grant by the United States District Court for the Southern District of New York (Robert W. Sweet, Judge) of a Rule 12(b)(6) motion dismissing appellant's complaint.  The principal issue is whether standard lock-up agreements in an IPO between lead underwriters and certain pre-IPO shareholders are alone sufficient to render those parties a "group" under Section 13(d) and subject to Section 16(b) disgorgement under the Securities Exchange Act of 1934.  We hold that they are not.  We, therefore, affirm.

JEFFREY S. ABRAHAM (Mitchell M.Z. Twersky & Philip T. Taylor on the brief), Abraham, Fruchter & Twersky, LLP, New York, NY, for Plaintiff-Appellant.

JAMES P. ROUHANDEH (Charles S. Duggan & Andrew Ditchfield on the brief), Davis Polk & Wardwell LLP, New York, NY, for Defendants-Appellees Lead Underwriters.

Andrew B. Clubok, Kirkland & Ellis LLP, New York, NY, for Defendant-Appellee Facebook, Inc.

---

*The Clerk is directed to amend the caption as above.

Michael A. Conley, John W. Avery, Nicholas J. Bronni, Securities and Exchange Commission, Washington, DC, for Amicus Curiae Securities and Exchange Commission.

WINTER, Circuit Judge:

Robert Lowinger appeals from Judge Sweet's dismissal of his complaint pursuant to Fed. R. Civ. P. 12(b)(6). The complaint asserted claims under the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), against, inter alia, appellees Goldman Sachs & Co., Morgan Stanley & Co., LLC, and J.P. Morgan Securities LLC (collectively "Lead Underwriters"). It sought to hold them liable under Section 16(b) for disgorgement of short-swing profits received in connection with their sales and purchases of shares in the course of Facebook, Inc.'s initial public offering ("IPO").

Section 16(b) requires a "beneficial owner" of ten percent or more of an issuer's stock to disgorge all profits realized from short sales or purchases of that security within a six-month period. See 15 U.S.C. § 78p(b). The Lead Underwriters alone did not meet the ten-percent threshold. However, "beneficial owner," as defined in Section 13(d) of the Exchange Act, includes "groups." Appellant contends that the Lead Underwriters and certain pre-IPO shareholders together formed a group under Section 13(d).

5

The group was allegedly formed by lock-up agreements between the Lead Underwriters and pre-IPO Shareholders ("Shareholders"). The lock-up agreements prevented the Shareholders from selling their stock for a specified period of time except as permitted by the Lead Underwriters. The district court dismissed the complaint on the grounds that the lock-up agreements alone did not render the Lead Underwriters beneficial owners of the aggregated shares held by the Shareholders under Section 13(d). Because we agree that this standard form lock-up agreement is insufficient, on its own, to establish a group under Section 13(d), we affirm.

BACKGROUND

Upon review of a dismissal of a complaint under Fed. R. Civ. P. 12(b)(6), the facts, and inferences to be drawn from those facts, are viewed in the light most favorable to the plaintiff. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

This appeal arises from the May 18, 2012 IPO by Facebook, Inc. ("Facebook"). The offering was underwritten by a syndicate of thirty-three financial firms (collectively, "Underwriters"), including the three Lead Underwriters. Goldman was a Lead Underwriter, and some Goldman subsidiaries owned Facebook shares. As part of the IPO process, each of the Shareholders (who, in the aggregate, owned more than ten percent of Facebook's common stock) entered into lock-up agreements with the Lead Underwriters

6

in order to "induce the Underwriters that may participate in the Public Offering to continue their efforts in connection with the Public Offering." J. App'x at 73. Appellant makes no claim that these lock-up agreements departed from standard underwriting practices.

The lock-up agreements generally provided that the Shareholders would not sell or otherwise dispose of Facebook stock for periods ranging from 91 days to 211 days after the date of the Prospectus without the consent of Morgan Stanley as agent for the Lead Underwriters. The agreements were disclosed in Facebook's Prospectus and Registration Statement.[1]

As is common in IPOs, the Registration Statement and Prospectus alerted investors that the Underwriters might "over-allot," i.e., sell more than the 421 million shares earmarked for the IPO. Permitting such sales allows underwriters to stabilize fluctuating share prices during an offering by increasing the supply of shares after the offering price has been determined. This ensures (and assures investors) that the entire underwritten amount is sold. Underwriters generally hedge this extra allotment by establishing a short position on oversold shares while simultaneously holding the shares long.

---

[1] We may consider Facebook's Registration Statement and Prospectus as documents integral to the complaint. See Chambers, 282 F.3d at 152-53; see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 808-09 (2d Cir. 1996).

Underwriters are thus protected against upward or downward movements in the stock's price.  The Facebook IPO permitted the Underwriters to cover this short position either by purchasing the requisite additional shares directly from Facebook and the Shareholders at a fixed price (per the terms of a so-called "over-allotment option," or "Green Shoe"), or by purchasing shares directly from the open market once secondary trading had commenced.[2]

Because of their role in the IPO, the Lead Underwriters were necessarily granted access to nonpublic financial information concerning Facebook.  In March and April 2012, Facebook shared its internal forecasts with the Lead Underwriters for both the second quarter of 2012 and for fiscal year 2012.  These forecasts estimated revenue between $1.1 and $1.2 billion and approximately $5 billion, respectively.  That information was "incorporated into materials used by the Underwriters to market the Facebook IPO to investors in a road show commenced on May 7, 2012."  J. App'x at 20.

---

[2] Facebook's Registration Statement disclosed that "the underwriters may engage in transactions that stabilize, maintain or otherwise affect the price of the Class A common stock." J. App'x at 43. This gave leeway to the IPO underwriters by allowing them to "sell more shares than they are obligated to purchase under the underwriting agreement, creating a short position" that they could cover by exercising a Green Shoe option or "by purchasing shares in the open market."  Such open-market purchases "may raise or maintain the market price of the Class A common stock above independent market levels or prevent or retard a decline in the market price of the common stock."

That same day, May 7, however, the complaint alleges, Facebook revised its revenue estimates downward for the second quarter to the low end of the $1.1 to $1.2 billion range and projected the 2012 fiscal year estimate to be 3% to 3.5% lower than the previously forecasted $5 billion. Facebook shared those concerns with Morgan Stanley. On May 9, Facebook amended its Registration Statement to advise potential investors of its revised estimates.

On May 17 and 18, 2012, the Underwriters sold 484,418,657 shares of Facebook common stock to the public at prices ranging from $38.00 to $42.05 per share. Facebook received $37.582 for each share sold and the Underwriters received discounts and commissions amounting to $0.418 per share. Over 310 million of these shares were sold by the Lead Underwriters, which generated $129,000,000 in discounts and commissions for appellees.

Stating that the amendment to the Registration Statement did not adequately disclose the revised estimates, the complaint alleges that only after trading closed on May 18, 2012, did the investors become aware that the Underwriters had already cut their estimates for Facebook ahead of the IPO.[3] On May 21, the first trading day thereafter, Facebook's stock price declined to

---

[3] Because this appeal raises only a claim under Section 16, which imposes a strict-liability rule, as discussed _infra_, the adequacy of disclosure and the misuse of material, nonpublic information are not before us.

"$34.03 on extremely high volume reflecting a decline of more than 10%" from the IPO price. J. App'x at 25. On May 22, 2012, a report by Reuters further divulged that the revised projections had been revealed by the Underwriters to select clients in a manner that avoided a general and direct disclosure of the relevant material information. The decline continued and on May 22, Facebook's stock closed at $31 per share -- 18.42% below the IPO price -- on high trading volume.

During that period, the Underwriters declined to exercise their Green Shoe option to cover their short positions, choosing instead to purchase the over-allotted shares directly on the secondary market, at prices lower than the Green Shoe fixed price of $38.00 per share. As a result, the Underwriters "made a profit of about $100 million with the bulk of that profit [having been] made on" May 21. J. App'x at 26 (internal citation and quotation marks omitted).

On September 12, 2012, appellant, a Facebook shareholder, made a demand on Facebook that it compel J.P. Morgan, Morgan Stanley, and Goldman to disgorge their profits -- as explained infra, calculated under Section 16(b) by subtracting the sales prices of May 17 from the purchase prices during the following four days. Facebook declined to bring suit, and appellant filed

his complaint on June 12, 2013.[4]

On May 2, 2014, the district court granted appellees' motion to dismiss the complaint. It held that because appellant's Section 13(d) group allegation was based entirely on the lock-up agreements, it was insufficient to state a claim under Section 16(b). The district court noted that "[b]ecause lock-up agreements are standard industry practice," they are, without more, "insufficient to establish a Section 16(b) group." In re Facebook, Inc., IPO Sec. & Derivative Litig., 986 F. Supp. 2d 544, 553 (S.D.N.Y. 2014). The district court declined to reach the alternative argument that the Underwriters' transactions were exempt under SEC Rule 16a-7 as part of a good faith underwriting.[5]

---

[4] The Facebook IPO has spawned multiple lawsuits that have been consolidated in the district court. See In re Facebook, Inc., IPO Sec. & Derivative Litig., 922 F. Supp. 2d 475, 477 (S.D.N.Y. 2013). Only the Section 16 issues are before us.

[5] With regard to the Rule 16a-7 issue, the court stated, "Whether, if beneficial owners, the Lead Underwriters would be exempt from Section 16 liability under Rule 16a-7 presents certain complex and unprecedented issues, for instance, whether Defendants' creation of informational disparities accompanied by unusually high levels of short selling, though compliant with the letter of the law, may still be 'indecent' or 'dishonest' for purposes of determining 'good faith.' The Court declines to reach these issues at this time, because even if the Lead Underwriters are not exempt under the statute, they lack the prerequisite 'beneficial owner' status for Section 16 to apply." In re Facebook, Inc., 986 F. Supp. at 554 (internal citations omitted). In view of our disposition of this matter, we also do not address this Rule 16a-7 issue.

11

This appeal followed. We solicited, and received, the views of the SEC, as _amicus_ _curiae_, relevant to the disposition of this appeal.

DISCUSSION

We review _de_ _novo_ a district court's dismissal of a complaint pursuant to Rule 12(b)(6). _See_ _Chambers_, 282 F.3d at 152. To survive dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." _Bell_ _Atl. Corp. v. Twombly_, 550 U.S. 544, 570 (2007).

Section 16(a) of the Exchange Act provides that any director, officer, or "beneficial owner of more than 10 percent of" a firm's securities, commonly called "statutory insiders," must report to the SEC the amount owned and must disclose changes in ownership. 15 U.S.C. § 78p(a). Section 16(b), intended to prevent the defined insiders from profiting from short-swing variations in share price, imposes a strict-liability rule for disgorgement of profits. It states:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner . . . by reason of his relationship to the issuer, any profit realized by him from any purchase and sale . . . of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner . . . in entering into such transaction.

15 U.S.C. § 78p(b). A disgorgement action may be brought by the issuer or on behalf of the issuer by a security holder, like appellant. Because Section 16(b) operates regardless of intent and calculates "profits" in an automatic and non-intuitive way,[6] we have cautioned that Section 16(b) is a "blunt instrument" to be confined within "narrowly drawn limits." Magma Power Co. v. Dow Chem. Co., 136 F.3d 316, 321 (2d Cir. 1998) (internal quotation marks omitted).

To state a claim, the complaint here must allege facts demonstrating that appellees were at relevant times statutory insiders, i.e., as pertinent here, beneficial owners of more than ten percent of Facebook's stock. Congress did not explicitly define the term "beneficial owner," see Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001), but the SEC has adopted Exchange Act Rule 16a-1, defining beneficial owner to mean "any person who is deemed a beneficial owner pursuant to Section 13(d) of the [Exchange] Act and the rules thereunder,"

_____

[6] Section 16(b), long recognized by this court as a "crude," "arbitrary," and "Draconian" mechanism for curbing insider trading, see Blau v. Lamb, 363 F.2d 507, 515 (2d Cir. 1966), is especially so with respect to calculating the amount of "profit realized" from short-swing trading, see Smolowe v. Delendo Corp., 136 F.2d 231, 239 (2d Cir. 1943) (setting forth the general procedure for calculating disgorgement under Section 16(b)). Under the established method of calculating disgorgeable "profit" for Section 16(b) purposes, an individual may be charged with a Section 16(b) "profit" even when his or her relevant trading actually resulted in a substantial financial loss. See Feder v. Frost, 220 F.3d 29, 32 (2d Cir. 2000); Adler v. Klawans, 267 F.2d 840, 847-48 (2d Cir. 1959). For example, imagine a statutory insider who purchases 100 shares at $100 per share on January 1, sells 100 shares at $50 per share on February 1, purchases 100 shares at $150 per share on March 1, and sells 100 shares for $125 per share on April 1. This trader has lost $7,500 in real terms, but he has a profit of $2,500 for Section 16(b) purposes. See Smolowe, 136 F.2d at 239.

17 C.F.R. § 240 16a-1(a); see also Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-28869, 56 Fed. Reg. 7242, 7244 (Feb. 21, 1991).  Section 13(d) requires any person acquiring beneficial ownership of five percent or more of a corporation's common stock to disclose certain information.  See 15 U.S.C. § 78m(d).  Section 13(d)'s purpose is to compel disclosure of certain events that may portend changes in corporate control.  Wellman v Dickinson, 682 F.2d 355, 365 (2d Cir. 1982).

Exchange Act Rule 13d-3(a) describes a beneficial owner as "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:  (1) Voting power . . . ; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security."  17 C.F.R. § 240.13d-3(a).  Additionally, according to Section 13(d)(3), "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."  15 U.S.C. § 78m(d)(3); see also 17 C.F.R. § 240.16a-1(a)(1).  Ultimately, according to Exchange Act Rule 13d-5(b)(1), "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed

14

thereby shall be deemed to have acquired beneficial ownership, for purposes of section [] 13(d) . . . of all equity securities of that issuer beneficially owned by any such persons."  17 C.F.R. § 240.13d-5(b)(1).  This Rule tracks the language of Section 13(d), except for its addition of "voting" to the acts that trigger a "group" finding.

It is agreed that the Underwriters themselves did not hold ten percent of Facebook's stock.  Rather, appellant alleges that the Underwriters were members of a group that in the aggregate held ten percent of Facebook shares.  This group was allegedly formed by the lock-up agreements between the Lead Underwriters and Shareholders, which prevented the Shareholders from selling ("disposing," in statutory language) their pre-IPO shares of Facebook stock for a specified period of time after the IPO without the Lead Underwriters' consent.

A plain language argument suggests application of Section 13(d), but we have explicitly avoided holding that such an agreement, without more, forms a group under Section 13(d).  Rather, we have stated only that a lock-up agreement "may bear upon" the question of whether a group exists or that evidence of coordination in acquiring, holding, or disposing of securities may demonstrate the existence of a group.  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 127 (2d Cir. 2001); see also CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP, 654 F.3d 276, 283

15

(2d Cir. 2011) (noting that the "touchstone" of the court's finding of a group is that "the members combined in furtherance of a common objective" to acquire, hold, vote or dispose of securities) (internal quotation marks omitted).

Our reluctance to recognize the existence of a "group," notwithstanding a contractual arrangement explicitly limiting the disposal of shares, reflects the fact that lock-up agreements, rather than being agreements "to act together," are generally one-way streets keeping certain shareholders out of the IPO market for a specified period of time or without compliance with other restrictions, as discussed immediately below.

However, we cannot avoid a larger, legitimate concern emphasized in the SEC's amicus brief over applying Section 13(d) literally in the context of standard lock-up agreements.  As the brief notes, a lock-up agreement is common, Brief of the SEC as Amicus Curiae, at 19 (citing NYSE/NASD IPO Advisory Comm., Report & Recommendations of a committee convened by the NYSE, Inc. & NASD at the request of the U.S. Securities and Exchange Commission (May 2003), at p.16, available at http://www.finra.org/sites/default/files/Industry/p010373.pdf), even essential, to the typical IPO, and some other public offerings as well, id. at 19-22.  Such an agreement assures potential buyers of securities in the IPO "that shares owned [by pre-IPO shareholders of the issuer will not] enter the public

16

market too soon after the offering." Initial Public Offerings: Lockup Agreements, Fast Answers, U.S. Securities & Exchange Commission, <u>available at</u> http://www.sec.gov/answers/lockup.htm (last visited Oct. 17, 2016); <u>see also</u> <u>In re Facebook, Inc.</u>, 986 F. Supp. 2d at 553. These assurances lead investors reasonably to expect an orderly market free of the danger of large sales of pre-owned shares depressing the share price before the pricing of the newly offered shares has settled in the market.

Applying Section 16(b) to underwriters engaged in lock-up agreements as facilitators of a public offering would impair the market for public offerings by complicating the role of underwriters -- adding tens of millions of dollars in legal exposure to the underwriters' costs. As parties to lock-up agreements, the underwriters are not acting as investors seeking to buy low and sell high. Rather, they are conduits for the distribution of securities in an offering to the public in which their participation begins and ends with the offering. A central role of the standard lock-up agreement is to limit the investment decisions of large shareholders in order to bring about an orderly, and successful, offering.

Public offerings are heavily regulated. <u>See, e.g.</u>, <u>In re Public Offering Fee Antitrust Litig.</u>, 98-cv-7890 (LLM), 2003 WL 21496795, at *2 (S.D.N.Y. June 27, 2003); David A. Westenberg, <u>Initial Public Offerings:  A Practical Guide to Going Public</u>,

17

§ 18:12 (1st ed. 2011). Among the most heavily regulated are IPOs. See Adoption of Integrated Disclosure System, Securities Act Release No. 33-6383, 47 Fed. Reg. 11380 (Mar. 16, 1982). Disclosure to the public of relevant facts is extensive and, in this case, included all of the pertinent facts asserted in the complaint. IPOs contemplate the sharing of confidential financial information with underwriters, agreements between underwriters and large pre-IPO shareholders limiting disposal of their shares, and trading by underwriters in the course of the offering. Far from being nefarious, these actions benefit existing shareholders and new public investors. For example, one purpose of the regulation of public offerings is to enhance relatively accurate pricing of the offering's shares by disclosure before sales of an offering to the public are allowed. See 15 U.S.C. § 77h. Achieving that purpose requires assurances of control over the disposition of blocs of shares owned by large pre-IPO investors, and lock-up agreements provide that control. (One effect of a lock-up agreement in an IPO is to prevent pre-IPO insiders from using nonpublic information to trade in a nascent public market.) The purpose also requires stabilization efforts by underwriters, as discussed above. Lock-up agreements are, therefore, essential to the regulation of public offerings.

As amicus, the SEC advises us that ordinary lock-up agreements do not implicate the purposes of Section 13(d) and its

definition of a "group." Section 13(d) is intended to alert investors about possible changes in control and provide information about possible parties to those changes. See, e.g., Brief of the SEC, Amicus Curiae, Morales v. Quintel Entm't, Inc., 249 F.3d 115 (2d Cir. 2001), at 20-21 ("There is no doubt that the purpose of Section 13(d) is to require disclosure of information by persons who have acquired a substantial interest, or increased their interest in equity securities of a company by a substantial amount . . . so that investors might assess the potential for changes in corporate control and adequately evaluate the company's worth.") (internal quotation marks omitted). To that end, the beneficial ownership rule seeks to "prevent a group of persons who seek to pool their voting or other interests . . . from evading" Section 13(d)'s disclosure requirements. Wellman, 682 F.2d at 366 (quoting S. Rep. No. 550, 90th Cong., 1st Sess. 8 (1967)).

While appellant is correct that both the Underwriters and Shareholders hoped to profit from the IPO -- the Underwriters profiting according to the underwriting agreement and the Shareholders profiting from a newly established public market for their shares -- this common objective creates no need for information about potential changes in control beyond that inherent in a public offering. Using Section 13(d) to create a "group" subject to Section 16(b) would impose large damages on

transitory conduits of a public offering of shares. This imposition of damages would have nothing to do with the allaying of concerns about changes in control but would greatly raise the costs, and reduce the number, of IPOs.

To be sure, our analysis applies only to standard lock-up agreements like those at issue here. As the SEC's <u>amicus</u> brief states, "[a]typical language in the lock-up agreement, or other facts and circumstances outside of the lock-up agreement," may trigger a Section 13(d) "group" finding. Brief of the SEC as <u>Amicus Curiae</u>, at 22. Our cases, discussed <u>supra</u>, have clearly indicated that coordination between underwriters and the other parties to a lock-up agreement with implications for control changes beyond those inherent in an IPO might trigger such a finding. But no facts alleged in this matter, in the petition for reconsideration in the district court, or in the request to amend persuade us that such a trigger exists.[7]

We, therefore, affirm.

---

[7] Appellant also advances an argument based on the fact that Goldman subsidiaries owned some pre-IPO Facebook shares. The substance of appellant's argument is rendered rather murky by issues related to how it was raised in the district court. Goldman's subsidiaries' ownership of pre-IPO Facebook shares was disclosed in the documents filed with the SEC that accompanied the IPO and its underwriting. J. App'x at 106. These documents were before the district court on the motion to dismiss, but appellant raised the stock ownership issues as relevant only in its motion for reconsideration in the district court. It comes before us as a claim of error by that court either in its decision on the merits or in the court's declining to allow the complaint to be amended. We hold that these allegations do not render the lock-up agreements here as atypical in a way pertinent to our refusal to apply Section 13(d). No facts that might be alleged by plaintiff suggest, whether the lock-up agreements covered the Goldman shares or not, any implications regarding control changes as contemplated by Section 13(d) as is fully explained in the text.

20